704 A.2d 62

WILLIAM TANIS, JR., PLAINTIFF–APPELLANT, v. TOWNSHIP OF
HAMPTON, A MUNICIPAL CORPORATION OF THE STATE OF
NEW JERSEY, LOCATED IN SUSSEX COUNTY, THE TOWN-
SHIP COMMITTEE OF THE TOWNSHIP OF HAMPTON AND
THE ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP
OF HAMPTON, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued September 30, 1997—Decided December 29, 1997.

590

Before Judges DREIER, KEEFE and WECKER.

*Kevin D. Kelly* argued the cause for appellant (*Kelly, Gaus & Holub,* attorneys; *Mr. Kelly,* on the brief).

*Marianne Wuillamey* argued the cause for respondents Township of Hampton and the Township Committee of the Township of Hampton (*Addas and Potenza,* attorneys; *Ms. Wuillamey,* on the brief).

*Robert T. Morgenstern* argued the cause for respondents Hampton Township Zoning Board of Adjustment (*Dolan and Dolan,* attorneys ; *William M. Cox* and *Mr. Morgenstern,* on the brief).

The opinion of the court was delivered by

WECKER, J.A.D.

The question presented by this appeal is whether a private landing strip for small aircraft is a permitted accessory use of farmland property within the meaning of the Municipal Land Use Law, *N.J.S.A.* 40:55D–1 et seq. (MLUL), and the local zoning ordinance. For reasons we shall explain in this opinion, we conclude that it is not. In so concluding, and to the extent that our decision is inconsistent therewith, we disagree with the holding of *Schantz v. Rachlin,* 101 *N.J.Super.* 334, 244 *A.*2d 328 (Ch.Div.1968), *aff'd o.b.,* 104 *N.J.Super.* 154, 249 *A.*2d 18 (App.Div. 1969).

Plaintiff William Tanis, Jr., appeals from a judgment in favor of defendants in his action in lieu of prerogative writs against the Township of Hampton, the Township Committee of the Township of Hampton,[1] and the Zoning Board of Adjustment of Hampton Township ("the Board"). Plaintiff brought the action to challenge the Board's determination that he was not permitted to use a portion of his 168–acre property as a landing strip for a single engine airplane. Plaintiff did not seek a use variance for the

---

[1] Although the caption and plaintiff's notice of appeal name the Township and the Township Committee as defendants and respondents, none of plaintiff's contentions is directed at those entities. We therefore do not separately discuss those entities further.

landing strip, despite advice from the attorney for the Board that the landing strip required a variance.

Plaintiff contended before the Board and again in the Law Division that the landing strip should be permitted because it constituted a pre-existing non-conforming use; because it was a principal permitted use under the local zoning ordinance; and because it was a permitted accessory use. The Board held a full evidentiary hearing and rejected each of those arguments. In a comprehensive and well-reasoned oral opinion delivered on April 26, 1996, based upon the record at the municipal level, Judge Reginald D. Stanton concluded that because the procedure at the municipal level was, as plaintiff contended, somewhat "anomalous," the Board's ruling would not be accorded the usual presumption of validity. However, he rejected plaintiff's argument that procedural improprieties in the Board's consideration of his application required the court to vacate the Board's resolution. On the merits, the judge agreed with the Board, concluding that the landing strip was not a permitted use in any of the three zones spanned by plaintiff's property; that there was insufficient evidence to establish a prior nonconforming use; and that because the Hampton Township zoning ordinance prohibited all but expressly permitted accessory uses, and private landing strips were not among the expressly permitted uses, plaintiff's landing strip was not a permitted use.

Judge Stanton distinguished this case from *Schantz v. Rachlin, supra,* on the ground that the Hampton Township ordinance prohibited all but specific, expressly permitted accessory uses, whereas the ordinance at issue in *Schantz* defined an accessory use as one "clearly incidental or subordinate to the principal ... use...." and did not include a general restriction against all other uses. In *Schantz* the court dismissed plaintiff's application to restrain defendant's use of a private landing strip and to compel its demolition, holding that such use did not violate the local zoning ordinance.

On appeal to this court, plaintiff argues that the Board's procedure was improper because Board members prejudged plaintiff's application and therefore could not render an impartial decision. Plaintiff argues that the landing strip is a valid accessory use, and local regulation of such use is preempted by state and federal law.[2]

The material facts are substantially undisputed. Plaintiff purchased his 168–acre tract in 1982. The tract had been part of a 4000–acre farm owned by plaintiff's family since the late 1940's or early 1950's. In January 1993, plaintiff built a house and began living on the property, where he raises cattle and horses and grows corn and hay. The property has extensive frontage on State Highway 206, near a variety of commercial and industrial uses. A portion of plaintiff's property is located in each of three zones: R–3 (single-family residential), HC–RD (highway commercial-research development), and HC–MFG (highway commercial-manufacturing industrial district). Plaintiff proposes a landing strip which would approximately bisect his property in the HC–RD and HC–MFG zones. The landing strip does not enter the R–3 (residential) zone. According to plaintiff's planner, the nearest residential developments are "thousands of feet away" from the airstrip, while according to the Board, there are several subdivisions "immediately adjacent" to plaintiff's property. The apparent factual dispute is explained by the fact that the referenced subdivisions are adjacent to that portion of plaintiff's property that lies within the R–3 zone, and not adjacent to the landing strip.

Plaintiff received his pilot's license in 1970 and maintains an aircraft sales and air charter business at a public airport in another municipality. Aircraft land on plaintiff's Hampton property about once a month, either for social or business purposes. Plaintiff owns a 1938 Piper Cub, a collector's item, which he wants to be able to land on a natural surface runway in a hay field on his

---

[2] Plaintiff does not argue on appeal that the airstrip is a principal permitted use. At oral argument, plaintiff conceded that there is insufficient evidence to establish a prior nonconforming use, and we therefore deem that argument withdrawn.

property. The plane has a 75 horsepower engine, a cruising speed of 70 miles per hour, and weighs 650 pounds. It needs 400 feet to take off and 300 feet to land. Plaintiff's proposed landing strip is 3,000 feet long and 50 feet wide and would also accommodate a light twin-engine aircraft. Plaintiff has predicted that two aircraft may be landing at the facility within five years.

The Hampton ordinance includes a general definition of an accessory use as one "customarily associated with and [ ] subordinate and incidental to the principal ... use...." The ordinance also lists permitted principal and accessory uses in each zone and includes a restrictive provision. Entitled "Prohibited Uses," § 108-4 provides: "All uses not expressly permitted in this chapter are prohibited." The R-3 district expressly permits single-family dwellings and farms as principal uses. Permitted accessory uses in the R-3 zone are farmstands, swimming pools, barns, greenhouses, toolsheds, and off-street parking. The HC-RD district permits agriculture, offices, industrial plants, wholesale distribution centers and warehouses, laboratories, planned industrial developments, and a variety of retail facilities as principal uses. Permitted accessory uses are off-street parking, fences, walls, garages, storage buildings, and temporary construction trailers. In the HC-MFG zone, permitted principal uses include retail, offices, manufacturing, warehousing and wholesale distribution centers. Accessory uses are off-street parking and storage buildings.

In order to maintain a "restricted use" (private) landing strip, plaintiff must obtain a license from the Department of Transportation, Office of Aviation (the "DOT"). *N.J.A.C.* 16:54-2.1(a). In response to plaintiff's application for a temporary and permanent aeronautical facility license in September 1994, neither the Federal Aviation Administration (FAA) nor the DOT itself had any objection to the proposed landing strip. Indeed, a DOT inspector described the location as ideal for such a restricted use facility as defined by *N.J.A.C.* 16:54-1.3. However, the DOT followed its

usual policy of considering "surrounding land uses [and] local land use ordinances" before issuing a license. *N.J.A.C.* 16:54–2.5(a).

Plaintiff first approached local officials in the fall of 1994, informally seeking approval for his landing strip. In December 1994 the attorney for both the planning board and the zoning board, Robert T. Morgenstern, advised plaintiff to apply for a use variance. Nevertheless, on April 24, 1995, plaintiff wrote to the DOT, asserting that he had a right to use the property for landing aircraft because:

> [s]ince we have owned this property, it has been used by myself and others as a landing strip for power aircraft, gliders, hot air balloons and a drop area for paratroopers from U.S. Army Reserve at Stewart Air Force Base in Newburg [sic], New York. This use has taken place continuously since 1951, it predates any Hampton Township Zoning Regulations. I believe my use is "grandfathered" and a "pre-existing use" prior to Hampton Township Zoning Laws.

Based on plaintiff's assertion that the use of the property predated the township's zoning ordinance and was therefore a protected nonconforming use, the DOT informed plaintiff's counsel by letter dated May 8, 1995, that it intended to issue a license. The DOT sent a copy of the May 8 letter to the Mayor of Hampton Township, who evidently referred it to the planning board. At its May 18, 1995, meeting the planning board instructed Morgenstern to notify both the DOT and plaintiff that the landing strip was neither permitted nor a valid, prior nonconforming use. Morgenstern did so by letter dated May 23, 1995.

The zoning board addressed the issue at a meeting on June 7, 1995, apparently because the Board had become aware that plaintiff was using the property to land his plane. The zoning board instructed Morgenstern to (1) notify plaintiff that he needed a variance and (2) inform DOT that plaintiff was violating the zoning ordinance. Morgenstern did so by letter dated June 8, 1995. Plaintiff received no notice that his proposal would be discussed by the planning board on May 18 or by the zoning board on June 7, and he was not present at either meeting.

On July 28, 1995, the DOT notified plaintiff that the municipality had expressed a "valid concern regarding land use as it pertains to

your proposed landing strip" and that plaintiff would have to resolve the issue with the municipality before the DOT would issue a license. Plaintiff then filed an application with the zoning board to declare that the landing strip was a protected nonconforming use of the property as well as a permitted accessory use.

After a hearing on November 1, 1995, which was continued on January 4, 1996, the zoning board rejected plaintiff's application and memorialized its decision in a resolution. The Board rejected plaintiff's nonconforming use argument on two grounds: (1) the landing strip was not permitted by the 1965 zoning ordinance, which predated the first established use of the landing strip, and (2) in any event, the occasional flights in and out of the property since 1970 were insufficient to establish a nonconforming use. The Board also ruled that the landing strip was not a permitted accessory use because the current ordinance treated accessory uses restrictively, listing permitted accessory uses and prohibiting all others.

In the Law Division, plaintiff did not challenge the planning board's right "to take a look at a situation like this and perhaps help the governing body to make its response [to the Department of Transportation]." Plaintiff did challenge the impartiality of the zoning board that heard his case and continues that argument on appeal. The Board discussed the issue in plaintiff's absence in June, months before his appearance at the November hearing. At the June meeting the Board heard comments of objectors and voted that the airstrip did not conform to the ordinance. Plaintiff therefore claimed that his application had been prejudged, and argued that the Board's final decision on his application was not "entitled to the presumption of correctness that [it] would otherwise have." Judge Stanton agreed. We are satisfied that Judge Stanton's determination with respect to plaintiff's procedural argument was correct, and that by denying the Board's decision the usual presumption of validity and addressing the substantive issues *de novo*, he cured any prejudice plaintiff may have suffered at the municipal level. Despite the June

discussion and vote in plaintiff's absence, we are satisfied that plaintiff had sufficient opportunity to present his witnesses and other evidence to the zoning board before a final decision was made the following January.

As a further ground for vacating the Board's resolution, plaintiff argued that local regulation of an airplane landing strip was preempted. Judge Stanton correctly rejected plaintiff's preemption argument. Plaintiff contends on appeal that the township's authority to adopt or apply land use regulations to prohibit a private landing strip is preempted by federal and state law, relying upon 49 *U.S.C.A.* § 40101 et seq. [formerly 49 *U.S.C.A.* § 1301 et seq.] (Federal Aviation Act); *N.J.S.A.* 6:1–20 et seq. (State Aviation Act of 1938). That argument is misguided. The federal government through the Federal Aviation Authority has the power to regulate the use of air space; however, state and local governments control the establishment of new airports or landing strips. *Gustafson v. City of Lake Angelus,* 76 *F.*3d 778, 783–89 (6th Cir.), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 81, 136 *L.Ed.*2d 39 (1996) (federal preemption does not bar local regulation of seaplane or other aircraft landing sites); *Garden State Farms, Inc. v. Bay II,* 77 *N.J.* 439, 446–49, 390 *A.*2d 1177 (1978) (local zoning ordinance barring heliports is not preempted and must be considered by DOT before acting on heliport application). The Commissioner of the DOT has supervisory power "over aeronautics within this State, including ... the avigation, flight and operation of aircraft, the establishment, location, maintenance, operation, size, design, repair, management and use of airports, landing fields, landing strips, heliports ... and other avigational facilities...." *N.J.S.A.* 6:1–29. The statute provides that "[t]he Commissioner shall have power to promulgate and adopt any reasonable rules and regulations that may be necessary to effectuate the purposes of this act in the interest of public safety and the development of aeronautics in this State." *Id.*

Pursuant to its statutory authority, in 1993 DOT adopted comprehensive regulations governing aeronautical activities. *N.J.A.C.*

16:54–1.1 to –10.1. Chapter 54 of the Administrative Code codifies the Commissioner's "ultimate authority over the regulating and licensing of aeronautical activities and facilities in New Jersey" to the extent not preempted by the FAA. *N.J.A.C.* 16:54–1.1(b). *See also N.J.A.C.* 16:54–10.1. The standard for issuing a license is whether the aeronautical facility "would be consistent with public health, safety and welfare, and the development of aeronautics in the State." *N.J.A.C.* 16:54–2.5(a). Surrounding land uses, local land use ordinances, and noise factors are among the required considerations. *Id.*

 Preemption by federal law is found under one of three circumstances:

First, Congress, in enacting a federal statute, may express a clear intent to preempt state law. Second, absent express preemption, federal law may have an implied preemptive effect if Congress revealed this intent by "occupying the field" of regulation. There is implied preemption when there is a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it" or "because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." There is a third type of preemption when state law actually conflicts with federal law. . . .

The focus of a preemption inquiry is on congressional intent.

[*Gustafson, supra,* 76 *F.*3d at 782–83 (citations omitted)]

State law preemption is found only under comparable circumstances: where the regulated field inherently requires uniform treatment at the state level; where the Legislature has expressed or implied by statute that it intends state regulation to be exclusive; or where a local regulation actually conflicts with the state statute or impedes a state policy expressed by statute. *Garden State Farms, supra,* 77 *N.J.* at 450, 390 *A.*2d 1177; *C.I.C. Corp. v. Township of East Brunswick,* 266 *N.J.Super.* 1, 7, 628 *A.*2d 753 (App.Div.1993), *aff'd,* 135 *N.J.* 121, 638 *A.*2d 812 (1994). No such circumstances appear here. Because the New Jersey Constitution requires liberal construction of legislation in favor of local authority, Art. 4, Section 7, paragraph 11, legislative intent to preempt local powers must be clear. *Garden State Farms, supra,* 77 *N.J.*

at 450, 390 *A.2d* 1177; *Kennedy v. City of Newark,* 29 *N.J.* 178, 187, 148 *A.*2d 473 (1959).

■ In *Garden State Farms,* the Court noted a "consistent legislative concern for the infusion of local thinking" into decisions to locate aeronautical facilities. 77 *N.J.* at 452–53, 390 *A.*2d 1177. While the statute gives the Commissioner of Transportation the authority to regulate and supervise aeronautical facilities and to override local zoning decisions, *id.* at 454, 390 A.2d 1177, the Commissioner must give due deference to municipal land use concerns as expressed in the zoning ordinance. *Id.* at 455, 390 A.2d 1177. When a landowner proposes the development of a new aeronautical facility, "a failure on the Commissioner's part to weigh conscientiously local interests, to examine carefully whether the proposed avigation facility is compatible with the surrounding land uses and to consult the local ordinances and authorities in making its licensing decision would constitute an abuse of discretion." *Id.* at 456, 390 A.2d 1177.[3]

■ Consistent with *Garden State Farms,* the regulations require that the applicant for a license for a restricted use aeronautical facility give due notice to the local governing body, *N.J.A.C.* 16:54–2.1(a)(1)(iv), and show conformance with local land use ordinances. *N.J.A.C.* 16:54–2.1(a)(6). Indeed, it was in response to an appropriate request from the Office of Aviation that the zoning board first took up the subject of plaintiff's landing strip at its June 1994 meeting and informed the Office that plaintiff's private landing strip did not conform to the local land use ordinance. Under these circumstances, the Board's authority to regulate and rule on plaintiff's proposed landing strip clearly was not preempted.

---

[3] The relationship between state law, local zoning law, and private property rights is discussed in a different context in *Patzau v. New Jersey Dept. of Transportation,* 271 *N.J.Super.* 294, 638 *A.2d* 866 (App.Div.), *certif. denied,* 138 *N.J.* 268, 649 *A.2d* 1288 (1994) (Air Safety and Hazardous Zoning Act of 1983, *N.J.S.A.* 6:1–80 to –88, and New Jersey Airport Safety Act of 1983, *N.J.S.A.* 6:1–89 to –97, are facially constitutional).

We therefore find that neither unfair prejudice at the municipal level, nor preemption by state or federal law, warrant our interference with the Law Division judgment. Having rejected plaintiff's contentions with respect to those issues, we now turn to the main issue: whether the zoning board properly rejected plaintiff's proposed private landing strip as an implied accessory use. The material facts in *Schantz* were virtually identical to those before us, with one exception. Unlike the local zoning ordinance involved in that case, the Hampton Township ordinance is restrictive. It provides that "[a]ll uses not expressly permitted ... are prohibited." Judge Stanton, giving appropriate controlling effect to *Schantz*, distinguished plaintiff's claim on the basis of the restrictive ordinance. We are not so constrained and are convinced that such a distinction, based solely on the restrictive form of the local zoning ordinance, does not go far enough in light of the implied nature of accessory uses and the impracticality of defining in advance every permissible accessory use.

Moreover, in addition to providing for specific accessory uses in each zone, the Hampton Township Zoning Ordinance includes the following general definition of an accessory use:

ACCESSORY BUILDING, STRUCTURE OR USE—A building, structure or use which is customarily associated with and is subordinate and incidental to the principal building, structure or use and which is located on the same lot therewith.[4]
[§ 108–7.]

In light of that general definition, implied accessory uses are arguably permitted notwithstanding the restrictive provision of § 108–4. We therefore feel compelled to address the broader question whether *Schantz* is consistent with the MLUL. With due concern for the role of precedent in our judicial system, we

---

[4] The Law Division judge apparently was not supplied with the complete ordinance and was not aware of § 108–7. Neither party corrected the judge's stated assumption that

you do not have an ordinance that simply refers to customary incidental accessory uses being allowed, and it does not refer to them being allowed in addition to specific ones. As far as I can see, it actually just lists all the permitted accessory uses. And so you have a slightly different category.

conclude that holding a private landing strip to be an implied accessory use in a residential, commercial, or industrial zone is inconsistent with the MLUL's delegation of zoning power to the municipality. *See N.J.S.A.* 40:55D–65a.

Where a purported accessory use is neither expressly permitted nor expressly forbidden by the zoning ordinance, a frequently expressed test for permitting or prohibiting that use is whether the principal permitted use logically implies the claimed incidental use. *See, e.g., Zahn v. Bd. of Adj. of City of Newark,* 45 *N.J.Super.* 516, 521–22, 133 *A.*2d 358 (App.Div.1957) (dry cleaning establishment is not an accessory use in a multi-family residence). As the Supreme Court noted in *Wyzykowski v. Rizas,* 132 *N.J.* 509, 518–19, 626 *A.*2d 406 (1993):

> Zoning ordinances frequently permit uses that are accessory or incidental to an expressly permitted use. However, they often do not define those permitted accessory uses, and courts must determine whether the proposed accessory use is "customarily incidental" to the main activity. In *Charlie Brown of Chatham, Inc. v. Board of Adjustment,* 202 *N.J.Super.* 312 [495 *A.*2d 119] (App.Div.1985), the Appellate Division reviewed the law defining "accessory" uses. Zoning ordinances that allow "customarily incidental" accessory uses to the main activity "permit, by implication, any use that logic and reason dictate are necessary or expected in conjunction with the principal use of the property. The law is not difficult to recite but difficult to apply * * * ." (citations omitted).

Thus even where an ordinance is drafted with specific and purportedly exclusive accessory uses permitted in each zone, zoning boards and courts will undoubtedly have to address unforeseen uses, not set forth in the ordinance. As stated in one well-known treatise, "[z]oning ordinances generally provide that any uses deemed 'customarily incidental' to the main activity may be conducted on the property. This type of provision permits any uses that logic and reason dictate are necessary or expected in conjunction with the principal use of the land." 12 Richard R. Powell and Patrick J. Rohan, *Powell on Real Property,* § 79C.04 [2][e] (1995). As then New Hampshire Supreme Court Justice Souter wrote for that Court, "[t]he rule of accessory use is a response to the impossibility of providing expressly by zoning ordinance for every possible lawful use." *Town of Salem v. Durrett,* 125 *N.H.* 29, 480 *A.*2d 9, 10 (1984).

With this background in mind, we consider whether the proposed landing strip is one permitted "by implication" based upon "logic and reason." We are informed by the Supreme Court's decision in *State v. P.T. & L. Construction Co., Inc.,* 77 *N.J.* 20, 389 *A.*2d 448 (1978), holding that a heliport on the premises of a Paramus highway construction company, intended to enable its executives to travel quickly to job sites, was a valid accessory use under a zoning ordinance similar to that of Hampton Township's. The Paramus ordinance specifically permitted eleven accessory uses as well as accessory uses "customarily incident" and "subordinate" to a permitted principal use. The ordinance also prohibited "[a]ll uses not expressly permitted...." *Id.* at 26, 389 A.2d 448. Judge Conford, temporarily assigned and writing for the Court, said:

> Clearly distinguishable, we think, are cases involving the use of aviation facilities other than helistops or heliports, such as airstrips for fixed-wing airplanes. *See Samsa v. Heck,* 13 *Ohio App.*2d 94, 234 *N.E.*2d 312 (Ct.App.1967) (airstrip not customarily incident to single family residence); *Town of Harvard v. Maxant,* 360 *Mass.* 432, 275 *N.E.*2d 347 (Sup.Jud.Ct.1971). *But see Schantz v. Rachlin,* 101 *N.J.Super.* 334, 244 *A.*2d 328 (Ch.Div.1968), *aff'd o.b.,* 104 *N.J.Super.* 154, 249 *A.*2d 18 (App.Div.1969).
>
> [*Id.* at 28-29, 389 A.2d 448.]

The Court's distinction between heliports and airstrips suggests that the Court would not have found a landing strip "for fixed-wing airplanes," such as plaintiff proposes, to be "customarily incident" and "subordinate" to the principal permitted use of the Paramus property. Also, its treatment of *Schantz* in its citation of authority causes us to question the continuing authority of that case.

 The Supreme Court described New Jersey's long-standing approach to determining whether a claimed accessory use is "customarily incident" to a permitted principal use:

> Concluding, therefore, that the ordinance permits accessory uses which are customarily incident to a permitted use and subordinate to the main permitted use, so long as not violative of any other affirmative requirement, we address the question whether the helistop use here implicated meets such specifications.
>
> In analyzing whether a use is customarily incident to the permitted use, two determinations must be made. The first is whether the use is incidental to the

main use: does the use " * * * bear a close resemblance and obvious relation to the main use to which the premises are put"? Second, it must be determined whether a use which is found to be incident to the permitted use is also a customary use. Generally, a use which is so necessary or commonly to be expected that it cannot be supposed that the ordinance was intended to prevent it will be found to be a customary use. *The fact that a use is not customarily indulged in, however, is not conclusive, and even if the use in question is found in a small percentage of similar main uses, the use may still be found to be "customary."*

[*Id.* at 26-27, 389 A.2d 448 (citations omitted) (emphasis added) ].

We infer from the emphasized language that the operative fact is not how often the primary use requires or involves the alleged accessory use, but whether incidents of the accessory use are often found in conjunction with this particular primary use. *See Jantausch v. Borough of Verona,* 41 *N.J.Super.* 89, 100, 124 *A.2d* 14 (Law Div.1956), *aff'd,* 24 *N.J.* 326, 131 *A.2d* 881 (1957) (certified on the Supreme Court's own motion) (beauty salon is permitted as accessory use in one family zone):

Is "customary" to be measured by reference to the state or to a more restricted area, perhaps the borough itself?

And is "customary" a mathematical concept in this context, and if it is, does it require the conduct of beauty culture in the home to be *the* habitual or *the* usual mode of operation measured on the basis of all beauty work in the area?.... The practice should be sufficient to justify the observation that is not unique or rare. It should be appreciable or perhaps substantial. It should be sufficient to constitute a recognized mode of activity in the field, but it need not be the more prevalent one.

*See also Town of Salem v. Durrett, supra,* upholding a finding that "an airstrip was not customarily associated with residential use" and stating "[a] rare association of uses cannot qualify as customary, though the uses need not be joined in a majority of instances of the principal use." 480 *A.2d* at 11. *See also* 40 Patrick J. Rohan, *Zoning and Land Use Controls,* § 40A.03[2][a] (1992) (discussing the "customary" use requirement in the context of home occupations).

Two significant factors appear to influence the determination whether an incidental use should be classified as customary: commonality and impact. Our consideration of each of those factors convinces us that the landing strip cannot be deemed customary. With respect to the first factor, commonality, the

decision maker has a duty to "determine whether it is usual to maintain the use in question in connection with the primary use." *Charlie Brown of Chatham, supra,* 202 *N.J.Super.* at 324, 495 A.2d 119. "The use must be further scrutinized to determine whether it has commonly, habitually and by long practice been established as reasonably associated with the primary use." *Id.* For example, in *Shim v. Washington Tp. Planning Bd.,* 298 *N.J.Super.* 395, 689 A.2d 804 (App.Div.1997), where we held that a day care center is a permitted accessory use of a church, we documented a modern trend showing that churches had increasingly responded to the pressing need for child care by allowing day care centers on their premises. 298 *N.J.Super.* at 407–09, 689 A.2d 804.

While the court in *Schantz* was clearly correct in holding that a use can meet the "customary" requirement even where the majority of permitted principal uses do not involve the proposed accessory use, 101 *N.J.Super.* at 340–41, 244 A.2d 328, here the record establishes beyond question that private landing strips are exceptionally unusual. According to the DOT official who testified before the Board in 1995, there are only sixty to eighty such landing strips licensed in the entire state. When *Schantz* was decided in 1968, there apparently were eighty licensed private landing strips. Obviously there has been no increase, and possibly a significant decrease, in the thirty years since *Schantz.* Based on these numbers, we are compelled to disagree with the conclusion reached by the trial judge in *Schantz* that "there is a sufficient use of [privately piloted] aircraft in our area so that it can be said that the installation of a landing strip for personal use is accessory to the use of property as a residence." 101 *N.J.Super.* at 342, 244 A.2d 328.[5]

---

[5] The trial judge in *Schantz* apparently gave great weight to the fact that the state had issued a license for the landing strip, *see* 101 *N.J.Super.* at 337, 244 A.2d 328, ignoring the challenger's contention that the license had been "improvidently granted" without first obtaining the required municipal certification of compliance with the local ordinance. *Id.* at 342–43, 244 A.2d 328. The judge

The second factor focuses on the impact of the use on the surrounding neighborhood and the zoning plan. This court long ago observed that "[u]se by a family of a home under our customs includes more than simple use of a house and grounds for food and shelter. It also includes its use for private religious, educational, cultural and *recreational* advantages of the family." *Borough of Chatham v. Donaldson*, 69 *N.J.Super.* 277, 282, 174 *A.*2d 213 (App.Div.1961). While we held that parking four automobiles in a residential driveway was a permitted accessory use, we limited implicitly permitted activities to those "not of such a nature, or to such an extent, as [would] impair the residential character of the neighborhood." *Id.* Arizona's intermediate appellate court applied a similar impact test: whether "a new use that is incidental is permissible should turn on whether that use, when generalized, would have a deleterious impact on legitimate zoning objectives." *Redington Ranch Associates v. Redman*, 153 *Ariz.* 437, 737 *P.*2d 808, 809 (App.1987) (helicopter used for recreational and commuting purposes could not be deemed a use accessory to a home).

 The impact of a proposed accessory use upon the surrounding area is thus recognized as an appropriate factor in determining whether the use is "so necessary or commonly to be expected that it cannot be supposed that the ordinance was intended to prevent it. . . ." *P.T. & L.*, *supra*, 77 *N.J.* at 27, 389 *A.*2d 448. *See also* 2 Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning and Planning*, § 23.05[2], [3] (1991) (discussing the negative impact of unusual animals, or an unusually tall radio or television antenna, on neighboring residents); Note, *Zoning: Accessory Uses and the Meaning of the "Customary" Requirement*, 56 *B.U. L.Rev.* 542, 556 (1976) (citing *City of Newark v. Daly*, 85 *N.J.Super.* 555, 558, 205 *A.*2d 459 (App.Div.1964)), *aff'd per curiam*, 46 *N.J.* 48, 214 *A.*2d 410 (1965) (milk vending machine in basement of apartment house found not to disturb residential

---

apparently discounted local concerns regarding public health and safety based upon the Legislature's delegation of power over licensure of landing strips to what was then the Division of Aeronautics. *Id.* at 343, 244 *A.*2d 328.

character of neighborhood and therefore to be a permitted accessory use).

As with all legislation, legislative intent is paramount and the ordinance must be interpreted as a whole, with due regard for its rationale and purpose. *E.g., Wright v. Vogt,* 7 *N.J.* 1, 5–6, 80 *A.*2d 108 (1951); *Sun Co., Inc. v. Zoning Bd. of Adj. of Borough of Avalon,* 286 *N.J.Super.* 440, 445, 669 *A.*2d 833 (App.Div.), *certif. denied,* 144 *N.J.* 376, 676 *A.*2d 1091 (1996). A use which impairs the municipality's land use plan or interferes with the neighbors' use and enjoyment of their properties would not be one the governing body intended to permit. Aircraft landing areas present legitimate noise and safety concerns that are likely to impact the surrounding area. *See Gustafson, supra,* 76 *F.*3d at 791. Such concern for the impact of a private landing strip upon the surrounding area is evidenced in the notice requirement of *N.J.A.C.* 16:54–2.1. *See also Garden State Farms, supra,* 77 *N.J.* at 455, 390 *A.*2d 1177. We agree with Judge Stanton's explanation:

It's not just that landing strips are so rare, but they do pose special kinds of problems to surrounding property owners. The aircraft do have to come into land and that means that they have to come in at relatively low levels over the lands of adjacent property owners.

. . . .

It might very well be that it makes sense in some areas to have landing strips. But they do pose special problems. They do inherently involve the need to do some low flying over neighboring property owners' lands. That raises some issues of noise pollution.

. . . .

So the point is that it's not only that these issues are very—these uses are very rare, so rare that I don't see how they could be considered customary and incidental, if that language means anything. But they're also somewhat problematic and when you put the rareness and the fact that they're problematic together, it seems to me that it just is not appropriate judicial interpretation of legislation to find that a landing strip, even a very restricted use landing strip on a farm is a customary and incidental use in this state.

Both the unusual nature of the proposed use and the potential negative impact of such a use militate against a finding that a landing strip is a use "customarily ... incidental" to the principal use of plaintiff's property.

While not determinative, it is instructive that our research reveals no jurisdiction that has deemed such a landing strip an implied accessory use in a residential, commercial, or industrial zone. *See also Redington Ranch Associates, supra; Samsa v. Heck,* 13 *Ohio App.*2d 94, 234 *N.E.*2d 312 (1967). *Cf. Town of Brookhaven v. Spadaro,* 204 *A.D.*2d 533, 612 *N.Y.S.*2d 175 (1994); *Twp. of Millcreek v. Hurst,* 27 *Pa.Cmwlth.* 85, 365 *A.*2d 896 (1976); *Clackamas County v. Portland City Temple,* 13 *Or.App.* 459, 511 *P.*2d 412 (1973). These cases reason that even if a landing strip is incidental to the main residential use, it cannot be deemed customary. *See generally* Robert Roy, J.D., Annotation, *Zoning: What Constitutes "Incidental" or "Accessory" Use of Property Zoned, And Primarily Used For Residential Purposes,* 54 *A.L.R.4th* 1034 (1987).[6]

Our Supreme Court has not addressed the question whether a municipality or a reviewing court can rely upon such a restrictive provision such as § 108–4 to exclude a proposed accessory use without addressing the two-step analysis described in *P.T. & L.* The rationale and common law history of implied accessory use suggest otherwise. In both *P.T. & L.* and *Shim,* just as in the Hampton Township ordinance, the local ordinance included a

---

[6] Several reported out-of-state decisions involve zoning ordinances that provide for an airport or landing strip as a "special" or "conditional" use that requires a permit. *See Alachua County v. Eagle's Nest Farms, Inc.,* 473 *So.*2d 257 (Fla.Dist.Ct.App.1985), review denied, 486 *So.*2d 595 (Fla.1986) (order for special use permit reversed because applicant failed to establish that the proposed private airstrip would not substantially impair the county's comprehensive zoning plan); *O'Donnell v. Basslers, Inc.,* 56 *Md.App.* 507, 468 *A.*2d 383 (1983), *cert. denied,* 299 *Md.* 426, 474 *A.*2d 219 (1984); *Von Lusch v. Bd. of County Com'rs. of Queen Anne's County,* 24 *Md.App.* 383, 330 *A.*2d 738 (1975). *Compare* the variance procedure available under *N.J.S.A.* 40:55D–70c and d and the conditional use provision authorized by *N.J.S.A.* 40:55D–67, each of which preserves local control over the location of a facility such as a landing strip.

general restrictive provision and a provision allowing accessory uses customarily incidental to a principal use. In each of those cases, the courts nevertheless analyzed the claimed accessory use, and in each case found the proposed use implicitly permitted. There is a substantial distinction between the helicopter landing area permitted in *P.T. & L.* as an accessory use and a landing strip for a fixed-wing aircraft. Any landing facility, other than one serving vertical take-off aircraft, implicates by its very nature the safety and comfort of persons in the surrounding area to such a degree that it cannot be implied as an accessory use. In *Shim* we relied on the "settled rule that an accessory use need not derive from the express terms of the ordinance; an accessory use is implied as a matter of law as a right which accompanies the principal use...." 298 *N.J.Super.* at 401, 689 *A.*2d 804. We declined "to conclude that [the] drafters intended to abrogate this settled zoning principle simply because [the ordinance] enumerated specific 'permitted' accessory uses." *Id.*[7]

Under the appropriate two-step analysis, we conclude that a private landing strip cannot, as a matter of law, be deemed a permitted accessory use in any zone involved here. It was, therefore, entirely reasonable for the local zoning board to refuse to accord accessory use status to plaintiff's landing strip, because such a ruling would have permitted such use by every property owner with substantial acreage in Hampton Township. The Law Division Judge correctly found that the zoning board properly exercised its power under *N.J.S.A.* 40:55D–70b to deny plaintiff's interpretation of the ordinance and to require plaintiff to submit a variance application for his landing strip. That is not to say that a use variance should necessarily be unavailable for such a landing

---

[7] In *L.I.M.A. Partners v. Borough of Northvale*, 219 *N.J.Super.* 512, 530 *A.*2d 839 (App.Div.1987), where the zoning ordinance, like Hampton's, included specific permitted accessory uses and a general restrictive provision against all other uses, we concluded that an accessory use that was not expressly permitted was prohibited. *L.I.M.A.* is distinguishable, however, because there we agreed with the trial court that installing a satellite dish was in fact the principal rather than an accessory use, and as such was not permitted.

strip. The variance procedure provided by the MLUL insures the municipality an appropriate opportunity to consider all the facts and circumstances, including the effect on the surrounding community and the local land use pattern, before a variant use such as a landing strip is permitted. Our decision today is without prejudice to any such application.

We affirm.