809 A.2d 188 (2002)
355 N.J. Super. 70
Deborah J. BEADLING, as Administratrix Ad Prosequendum of the Estate of James Beadling, Deceased, Plaintiff-Appellant,
v.
WILLIAM BOWMAN ASSOCIATES, a New Jersey Corporation, Expert Lubricants & Services, Inc., a New Jersey Corporation, Inland Leidy, Inc., and Enron Operations Corporation, Defendants, and
Dunlap Mellor & Company, Inc., a Pennsylvania Corporation, Defendant-Respondent.
Travelers Property Casualty, a Member of Citigroup, a/k/a The Travelers, Plaintiff-Appellant,
v.
William Bowman Associates, a New Jersey Corporation, Expert Lubricants & Services, Inc., a New Jersey Corporation, Inland Leidy, inc., and Enron Operations Corporation, defendants, and
Dunlap Mellor & Company, Inc., a Pennsylvania Corporation, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued September 23, 2002.
Decided November 14, 2002.
*190 Alexander W. Ross, Jr., argued the cause for appellants (Rakoski & Ross, attorneys, Marlton, for Deborah J. Beadling; Guy W. Killen, Woodbury, attorney for Travelers Property Casualty; Mr. Ross and Janice L. Heinold, Flemington, on the brief).
James T. Dugan, Secaucus, argued the cause for respondent (Joseph D. O'Neill, *191 attorney, Vineland; Mr. Dugan, on the brief).
Before Judges BRAITHWAITE, LINTNER and PARKER.
*189 The opinion of the court was delivered by LINTNER, J.A.D.
These consolidated appeals arise from a grant of summary judgment dismissing plaintiffs' products liability claims against defendant, Dunlap Mellor & Company. The claims arise from an accident that occurred when co-workers at an asphalt company used a fifty-five gallon drum that once contained methanol supplied by defendant as a workbench for cutting sheet metal with an acetylene torch. An explosion resulted that killed James Beading and severely injured Barry Szieber.[1] Szieber and his wife filed suit after which Beadling's estate did the same. Both complaints alleged that the warning labels placed on the drum by defendant were deficient due to their inappropriate location and the soft, porous nature of the paper on which the principal label was printed.[2] The two suits were consolidated. Szieber and his wife filed a stipulation of dismissal. Thereafter, Travelers Property Casualty, a member of The Citigroup, (Travelers) substituted as subrogee for Barry Szieber and filed an amended complaint incorporating the allegations found in the Szieber complaint and asserting that it was entitled to seek recovery of its workers' compensation lien arising out of benefits paid to Szieber, pursuant to N.J.S.A. 34:15-40.[3]
On appeal, plaintiffs essentially argue that the federal regulations do not preempt New Jersey products liability law and that, in any event, the labels did not comply with the federal requirements. They further contend that summary judgment was improvidently entered because there were sufficient facts to establish liability, mainly that defendant placed the labels on top of the drum in violation of the American National Standards Institute (ANSI) standards and use of a more durable label would have prevented the label that was used from becoming obscure. Plaintiffs also maintain that the opinions of their experts were not "net opinions" and were sufficient to create a genuine issue of material fact regarding the adequacy of the labels. Finally, they assert that defendant's negligence was a proximate cause of the accident because the use of a chemical solvent drum as a workbench was a foreseeable misuse that imposed a duty of care on defendant.
Although we are convinced that the contents of the warning itself were adequate and complied with the federal regulations, we are equally convinced that the federal regulations do not speak specifically to the location of the warning and neither expressly preempt, nor conflict with, the applicable ANSI standards respecting the appropriate placement or durability of the warning on drums used in an industrial environment. Further, we are satisfied that the opinions given by plaintiffs' experts *192 do not qualify as net opinions and should not have been disregarded by the motion judge. We, therefore, reverse and remand the order granting summary judgment to defendant.
We need not recount the facts at length. On the morning of the accident, Beadling and Szieber were in the maintenance shop at the Crowfoot Asphalt plant making braces for conveyor belt rollers. They placed a sheet of steel on top of a fifty-five gallon drum that once contained methanol, a flammable organic liquid used in fuel, windshield washer fluid and antifreeze. Beadling held the steel sheet in place while Szieber cut it with an acetylene torch. Sparks from the torch caused fumes in the drum to ignite, resulting in an explosion and fire.
The force of the explosion threw Beadling twenty-three feet across the shop and set him on fire. He died within a matter of minutes from smoke inhalation and thermal burns. Szieber sustained multiple fractures, partial thickness burns to nine percent of his body surface, and smoke inhalation injuries. He was hospitalized for approximately three weeks, during which time he underwent skin grafts, orthopedic surgery and respiratory therapy.
The Winslow Township Police Department, the Camden County Fire Department and the Federal Occupational Safety and Health Administration (OSHA) all conducted investigations of the accident. OSHA subsequently cited and fined Crowfoot Asphalt for failing to implement basic safety precautions by training its employees in the safe use of cutting and welding equipment and for failing to implement a written hazard communication program in the workplace.
Business records revealed that Crowfoot Asphalt obtained the fifty-five gallon drum of methanol involved in the accident from Expert Lubricants & Services, which had previously purchased it from defendant. At that time, Expert Lubricants & Services provided Crowfoot Asphalt with a Material Safety Data Sheet (MSDS) for methanol.
Michael Gooch, an employee of Crowfoot Asphalt, stated in a deposition that Beadling was the person primarily responsible for removing small amounts of methanol from the drum and placing it in compressor airline hoses in the winter to prevent moisture within them from freezing. He recalled seeing the drum that was involved in the accident in the outside yard turned upside down.
Bruce F. Lewis, an employee of Expert Lubricants & Services, stated that when drums were received from a supplier it was their general practice to check to ensure that they were properly labeled. Drums from defendant had a large label on top, a small one on the side, and flammable and poison labels on the side. According to Lewis, the top label provided all the warning information "[e]verything down to a torch," meaning "do not cut or anything like that."
Barry Mellor, defendant's owner, stated that he was personally responsible for off-loading chemical solvents from tanker trucks into fifty-five gallon drums. Therefore, the drum that was involved in the accident was probably filled by him with methanol. It was his practice to stencil the word "METH" and a lot number on top of the drum prior to filling. Immediately after filling, an eight-and-a-half by eleven-inch adhesive-backed label was placed on top of the drum. The label contained a flammability warning, a picture of a drum and a torch with a red "X" over them, and printed warnings concerning the use of methanol. Mellor also applied *193 vinyl "Flammable" and "Poison" labels to the top of the drum.
At the request of Travelers, engineering consultant Frank Schwalje conducted an inspection of the maintenance shop on the date of the accident, after fire and police investigators made their inspections. He was told that the drum involved in the accident had been stored outdoors and was moved inside by Beadling for use as a temporary workbench. It was approximately thirty-five inches in height and twenty-three-and-one-half inches in diameter and was painted blue on the sides with a yellow top head and a blue bottom head. The word "methanol" was hand-written in yellow marker on the side near the top of the drum and underneath in black lettering was written "airline antifreeze." The top of the drum, which was deformed outward from the force of the explosion, contained the stenciled letters "METH."
Schwalje found a partial label lying on the floor adjacent to the drum. Additional burned label remnants were discovered nearby. The label size conformed with the bright yellow area on the drum head, indicating that it was probably present on the drum before the incident. A small, square label found in the area of the drum contained the words "FLAMMABLE LIQUID" with a red background. Although the labels could not be read at the time of the inspection, Schwalje was able to render them legible by wiping them with dry cotton swabs.
Schwalje's written report concluded:
[I]t appears that while Mr. Beadling was utilizing the cutting torch to burn parts from steel plate that was resting on the methanol drum, the vapors contained within the drum ignited when coming in contact with the torch flame via the 1 inch open plug in the top of the drum. Once ignited, the rapid expansion of the vapors caused the bottom head of the drum to separate. The drum was propelled upward with the plate resting on top, causing the fatal injuries sustained by Mr. Beadling....
The drum in question should obviously not have been used for a workbench, particularly when cutting with a torch was anticipated. While the drum was empty of liquid, there was sufficient flammable vapor present to cause an explosion.... The flammability of the methanol was conveyed by the labeling contained on the drum head. Unfortunately, this information was not legible as the entire head of the drum was covered by a dark oily residue that completely obscured the written information contained on the label.
In a supplemental report, Schwalje wrote that "the placement of the label on the top of the drum subjected the label to exposure to grit, grime and other contaminants that can collect on the top of the drum surface when stored in an upward position." He opined that "a label would have been ... more legible had it been affixed to the sidewall of the drum." He also noted that "the exemplar label had a paper like texture and lacked any apparent plastic coating to protect the label," which made it "more likely to absorb contaminants.... [I]t would have been desirable and appropriate to affix additional warning information to the side of the drum using durable labels...."
George B. Stanton, Jr., a consulting engineer, also prepared a report on behalf of plaintiffs. After reviewing the facts underlying the incident and various labeling requirements, he concluded:
The labels, warnings, and instructions provided by the suppliers of methanol to Crowfoot were inadequate at the least because the labels could not be made legible.... The label location practice of the suppliers of methanol to Crowfoot *194 was inadequate. Labels were provided only on top of the drum. Had labels also been provided on the side of the drum, the label would have been visible to the user.
The selection of the product label stock by the suppliers of methanol to Crowfoot was inadequate because the product label absorbed oil and grease and could not be cleaned to be made legible. The absence of adequate labels, warnings, and instructions was a substantial factor in the explosion that killed Mr. Beadling.
In reaching his conclusion, Stanton cited the ANSI, section 10.1 requirement that labels have a "reasonable expected life with good ... word message legibility [which] shall take into consideration the expected life of the product and the foreseeable environment of use." Further, ANSI provides in section 9.2:
When feasible, placement of the sign or label should provide protection from foreseeable damage, fading or visual obstruction caused by abrasion, ultra-violet light, or substances such as lubricants, chemical or dirt.
Joel B. Charm, a certified industrial hygienist, prepared a report on behalf of defendant in which he reviewed defendant's label for compliance with federal and industry labeling requirements. He concluded that the label met all requirements with regard to warning about the flammability of methanol and the need to keep it away from any source of heat, sparks and flame. He further opined:
Plaintiffs were injured as a direct result of Crowfoot Asphalt's and their own egregious behavior and failure to follow basic safety procedures and common sense despite Dunlap Mellor's adequate warnings.... Had ... Crowfoot Asphalt followed basic safety procedures, adhered to OSHA regulations, followed NFPA practices, adequately trained its own employees in accordance with OSHA regulations, and followed the warnings on Dunlap Mellor's label for methanol, this accident would not have happened.
In granting defendant's motion for summary judgment, the motion judge found that the warning, which explicitly warned against the hazard that injured Szieber and killed Beadling, was on the drum as required by federal statutes and regulations which preempt the field. The judge further found that plaintiffs' claim that the labels could not be read because they were dirty and grimy was misdirected because the responsibility for maintaining the condition of the label so that it could be read fell on the employer. He concluded that, under the circumstances, defendant owed no duty of care to plaintiffs and no rational fact finder could attribute proximate cause for the accident to defendant.
The relevant federal enactments, the Federal Hazardous Substances Act (FHSA), 15 U.S.C.A. §§ 1261 to 1278, and OSHA's Hazard Communication Standard (HCS), 29 C.F.R. § 1910.1200 (2002), each contain an express preemption clause. See 15 U.S.C.A. § 1476; 29 C.F.R. § 1910.1200(a)(2). The FHSA was enacted "to provide nationally uniform requirements for adequate cautionary labeling of packages of hazardous substances which are sold in interstate commerce and are intended or suitable for household use." H.R.Rep. No. 86-1861 (1960), reprinted in 1960 U.S.Code Cong. & Admin.News 2833, 2833. In 1966, the FHSA was amended to add among other things a "limited preemption amendment which precludes State or local requirements for cautionary labeling of substances ... where the alleged hazard is of the general character dealt with by the Federal act." H.R.Rep. No. 89-2166 (1966), reprinted in 1966 U.S.Code *195 Cong. & Admin.News 4095, 4097. The 1966 amendment was prompted after six years of administrative experience that revealed that thousands of children were being poisoned, burned or overcome by fumes and otherwise accidentally injured annually through contact with unlabeled or inadequately labeled hazardous household chemical products. The stated purpose of the amendment is
to ban the sale of toys and other children's articles containing hazardous substances; to authorize the Secretary of Health, Education, and Welfare to ban the sale of other substances which are so hazardous in nature that they cannot be made suitable for use in or around the household by cautionary labeling; to extend coverage of the Hazardous Substances Labeling Act to unpackaged as well as packaged hazardous substances intended for household use; and to make it clear that household products treated with pesticides are not exempt from that act.
[1966 U.S.Code Cong. & Admin.News 4095, 4095.]
16 C.F.R. § 1500.3(c)(10)(i) (2002) defines a substance "intended, or packaged in a form suitable, for use in the household" and specifically includes
any hazardous substance, whether or not packaged, that under any customary or reasonably foreseeable condition of purchase, storage, or use may be brought into or around a house, apartment, or other place where people dwell, or in or around any related building or shed including, but not limited to, a garage, carport, barn, or storage shed. The term includes articles, such as polishes or cleaners, designed primarily for professional use but which are available in retail stores, such as hobby shops, for nonprofessional use. Also included are items, such as antifreeze and radiator cleaners, that although principally for car use may be stored in or around dwelling places. The term does not include industrial supplies that might be taken into a home by a serviceman. An article labeled as, and marketed solely for, industrial use does not become subject to this act because of the possibility that an industrial worker may take a supply for his own use. Size of unit or container is not the only index of whether the article is suitable for use in or around the household; the test shall be whether under any reasonably foreseeable condition of purchase, storage, or use the article may be found in or around a dwelling.

[Ibid. (Emphasis added).]
The Occupational Safety and Health Act authorizes the Secretary of Labor to promulgate federal occupational safety and health standards. 29 U.S.C.A. § 655(a). Pursuant to that authority, OSHA promulgated the HCS "to ensure that the hazards of all chemicals produced or imported are evaluated, and that information concerning their hazards is transmitted to employers and employees." 29 C.F.R. § 1910.1200(a)(1); see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 92, 112 S.Ct. 2374, 2380, 120 L.Ed.2d 73, 80 (1992) (noting that the Secretary has delegated certain statutory responsibilities to OSHA).
The HCS applies both to employers, such as Crowfoot Asphalt, and to distributors, such as defendant. 29 C.F.R. § 1910.1200(f)(3) provides:
Chemical manufacturers, importers, or distributors shall ensure that each container of hazardous chemicals leaving the workplace is labeled, tagged, or marked in accordance with this section in a manner which does not conflict with the requirements of the Hazardous Materials Transportation Act (49 U.S.C. *196 1801 et. seq.) and regulations issued under that Act by the Department of Transportation.
The HCS contains the following preemption provision:
This occupational safety and health standard is intended to address comprehensively the issue of evaluating the potential hazards of chemicals, and communicating information concerning hazards and appropriate protective measures to employees, and to preempt any legal requirements of a state, or political subdivision of a state, pertaining to this subject. Evaluating the potential hazards of chemicals, and communicating information concerning hazards and appropriate protective measures to employees, may include, for example, but is not limited to, provisions for: developing and maintaining a written hazard communication program for the workplace, including lists of hazardous chemicals present; labeling of containers of chemicals in the workplace, as well as of containers of chemicals being shipped to other workplaces; preparation and distribution of material safety data sheets to employees and downstream employers; and development and implementation of employee training programs regarding hazards of chemicals and protective measures. Under section 18 of the Act, no state or political subdivision of a state may adopt or enforce, through any court or agency, any requirement relating to the issue addressed by this Federal standard, except pursuant to a Federally-approved state plan.
[29 C.F.R. § 1910.1200(a)(2).]
The HCS requires labels on every container of hazardous chemicals unless the material is solid, in which case the label may be "transmitted with the initial shipment itself, or with the material safety data sheet that is to be provided prior to or at the time of the first shipment." 29 C.F.R. § 1910.1200(f)(2)(ii). It further mandates that the chemical manufacturer or distributor shall ensure that each container is labeled with the "[i]dentity of the hazardous chemical" and "[a]ppropriate hazard warnings." 29 C.F.R. § 1910.1200(f)(1)(i)-(ii). Moreover, the HCS provides that "[t]he employer shall not remove or deface existing labels" and "shall ensure that labels or other forms of warning are legible ... prominently displayed on the container, or readily available in the work area throughout each work shift." 29 C.F.R. § 1910.1200(f)(8)(9). Thus, the HCS regulations not only require manufactures and distributors to place appropriate labels warning of hazardous chemicals upon the container but also forbid the employer from removing or defacing those labels, and further mandate that the employer ensure that the labels placed upon the container by the manufacturer or distributor remain legible.
We begin our analysis with some preliminary observations of the doctrine of preemption. The preemption doctrine is rooted in the second clause of article VI of the United States Constitution, which provides that the laws of the United States "shall be the supreme Law of the Land... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2; Feldman v. Lederle Labs., 125 N.J. 117, 133, 592 A.2d 1176 (1991), cert. denied, 505 U.S. 1219, 112 S.Ct. 3027, 120 L. Ed.2d 898 (1992). "Federal regulations have the same preemptive effect as federal statutes." Id. at 134, 592 A.2d 1176. "As long as the agency (1) intended to preempt state law; and (2) acted within the scope of its delegated authority, federal regulations will displace conflicting state laws." R.F. v. Abbott Labs., 162 N.J. 596, 619, 745 A.2d *197 1174 (2000). Although the preemption doctrine applies equally to state common law and state statutory law, Feldman, supra, 125 N.J. at 134, 592 A.2d 1176, " `[o]rdinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law.'" English v. Gen. Elec. Co., 496 U.S. 72, 89, 110 S.Ct. 2270, 2280, 110 L.Ed.2d 65, 81 (1990) (quoting California v. ARC America Corp., 490 U.S. 93, 105, 109 S.Ct. 1661, 1667, 104 L.Ed.2d 86, 97 (1989)) (alteration in original); see also, Medtronic, Inc. v. Lohr, 518 U.S. 470, 495, 116 S.Ct. 2240, 2255, 135 L.Ed.2d 700, 721 (1996).
When considering issues of preemption, one starts with the assumption that the historic police powers of the states will not be superseded by a federal act absent the clear and manifest purpose of the federal government to do so. Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422 (1992). This presumption against preemption is particularly strong when the subject matter involves an area, such as tort compensation, which has traditionally been defined solely by state law. Feldman, supra, 125 N.J. at 137, 592 A.2d 1176.
The purpose of Congress or the federal agency is the touchstone for analyzing the applicability of preemption. There are several ways to prove preemption. First, "Congress explicitly may express its intent to preempt state law." R.F., supra, 162 N.J. at 645, 745 A.2d 1174; see also Feldman, supra, 125 N.J. at 134, 592 A.2d 1176 (citing Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 299, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316, 325 (1988)). Second, "preemption may be inferred where the federal legislation is so comprehensive that it creates the inference that Congress intended to leave no room for state regulation in the area." R.F., supra, 162 N.J. at 645, 745 A.2d 1174; Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 77, 577 A.2d 1239 (1990). Third, "[p]reemption also may be found where state law actually conflicts with federal law." R.F., supra, 162 N.J. at 645, 745 A.2d 1174.
The expression on the part of Congress or a federal agency to preempt state law does not end the inquiry as the specific domain that is preempted still must be determined. Gade, supra, 505 U.S. at 103, 112 S.Ct. at 2385, 120 L.Ed.2d at 87. "`[E]ven when Congress declares its preemptive intent in express language, deciding exactly what it meant to preempt often resembles an exercise in implied preemption analysis.'" R.F., supra, 162 N.J. at 618, 745 A.2d 1174 (quoting 1 Laurence H. Tribe, American Constitutional Law § 6-28 (3d ed.2000)). Therefore, cases addressing questions of federal preemption tend to defy useful generalization and are very specific to the regulated subject. Gurrieri v. William Zinsser & Co., Inc., 321 N.J.Super. 229, 236, 728 A.2d 832 (App.Div.1999). Conflict preemption occurs in two instances: where "`compliance with both federal and state regulations is a physical impossibility,' or where state law `stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" R.F., supra, 162 N.J. at 618, 745 A.2d 1174 (quoting Gade, supra, 505 U.S. at 98, 112 S.Ct. at 2383, 120 L. Ed.2d at 84). The same analysis for federal preemption of state law applies to federal preemption of local law. See Garden State Farms, Inc. v. Bay, 77 N.J. 439, 446, 390 A.2d 1177 (1978) (finding that state and local governmental efforts to regulate the location of helistops are not preempted by federal law); Tanis v. Township of Hampton, 306 N.J.Super. 588, 599-601, 704 A.2d 62 (App.Div.1997) (finding that zoning board of adjustment's *198 authority to regulate and rule on a proposed landing strip not preempted by state or federal law).
Plaintiffs do not contend that the content of the warnings provided were inadequate. Instead, plaintiffs' experts point to the durability of the paper used by defendant and the fact that the warnings, though adequate, were placed upon the top of the drum where they would be subject to being obscured by dust and dirt in the environmental setting. Defendant argues that both OSHA and FHSA preempt plaintiffs' products liability action.
Application of the principles of preemption to the federal enactments at issue convinces us that defendant's arguments are unpersuasive. First, as we have noted, the provisions of OSHA and the HCS require defendant, as a manufacturer, to identify the hazardous chemical and provide "appropriate hazard warnings." The HCS does not speak to the location of the warning. The provision in the HCS, which places the duty on the employer to ensure legibility of the labels and prominence of the label display, does not absolve the distributor from providing an appropriately located warning. Instead, it places additional responsibility on the employer to keep the warning legible. Neither OSHA nor the HCS is intended to preempt the inappropriate placement of a warning by either a distributor or manufacturer.
Moreover, a products liability action, which presents evidence that suggests that the location chosen is less than adequate given the foreseeable use of the product, is not in conflict with either OSHA or the HCS. While we do not pass upon the reasonableness of plaintiffs' position, we are satisfied that a requirement which calls for the placement of a warning label on the side of the fifty-five gallon drum is not physically impossible under OSHA or the HCS. Nor would it stand as an obstacle to accomplishing and executing Congress's purpose in enacting OSHA.
Likewise, we are not persuaded that the FHSA preempts plaintiffs' action. The FHSA is limited to household products. It expressly excludes industrial supplies or articles labeled for industrial use. The methanol here, which was sold in bulk, could not reasonably have been foreseen to be an article that would be found in or around a dwelling. Although defendant points to its use as a windshield washer fluid, a product commonly found in or around the household, the fact remains that methanol has multiple industrial uses both as a fuel and as antifreeze which, in the form in which it was sold here, take it out of the household product category.
Even if we were to agree with defendant that the FHSA does apply to the product here, the applicable regulations are neither in conflict with nor do they evidence an intent on the part of Congress to expressly or impliedly preempt the requirement urged by plaintiffs that the label be placed on the side rather than the top of the drum. The FHSA requires that warnings be stated "conspicuously" meaning
that, under customary conditions of purchase, storage, and use, the required information shall be visible, noticeable, and in clear and legible English. Some factors affecting a warning's prominence and conspicuousness are: Location, size of type, and contrast of printing against background. Also bearing on the effectiveness of a warning might be the effect of the package contents if spilled on the label.
[16 C.F.R. § 1500.3(c)(10)(ii).]
The theory of recovery advocated by plaintiffs is not in conflict with, nor is it expressly preempted by, these provisions of the FHSA.
*199 Defendant asserts that the experts' conclusions upon which plaintiffs base their theory of recovery are net opinions. Again, we disagree. It is well settled that on a motion to dismiss, the court's function is not to weigh the evidence but only to determine whether plaintiffs' proofs, together with all favorable inferences permissible therefrom, could sustain a judgment in plaintiffs' favor, i.e., whether plaintiffs have presented a prima facie case. See Davis v. Pecorino, 69 N.J. 1, 3, 350 A.2d 51 (1975); Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969); State v. Standard Tank Cleaning Corp., 284 N.J.Super. 381, 405, 665 A.2d 753 (App.Div.1995). Generally, an expert opinion must be supported by facts or data either in the record or of a type usually relied on by experts in the field. N.J.R.E. 703. An expert opinion that is not factually supported is a net opinion or mere hypothesis to which no weight need be accorded. See generally Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981). Opinions that lack a foundation are worthless. Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 305, 108 A.2d 616 (1954). However, if an expert provides the whys and wherefores rather than bare conclusions it is not considered a net opinion. Jimenez v. GNOC Corp., 286 N.J.Super. 533, 540, 670 A.2d 24 (App. Div.), certif. denied, 145 N.J. 374, 678 A.2d 714 (1996). It is inappropriate to grant summary judgment when expert opinion differs. Rubanick v. Witco Chem. Corp., 125 N.J. 421, 440-41, 593 A.2d 733 (1991).
We do not determine whether a jury will accept either expert's testimony. However, we are satisfied, based upon our review of the entire record, that the opinions given by Schwalje and Stanton have an adequate basis in fact and are arguably supported by ANSI, an organization which defendant concedes the industry uses to set its own standards.
Finally, defendant asserts that the judge correctly ruled that (1) defendant did not violate a legal duty owed to plaintiffs and (2) its conduct was not a proximate cause of the accident. Ordinarily, questions of proximate cause are left to the jury for its factual determination. Yun v. Ford Motor Co., 276 N.J.Super. 142, 160-61, 647 A.2d 841 (App.Div.1994) (Baime, J., dissenting), rev'd on dissent, 143 N.J. 162, 669 A.2d 1378 (1996); see also Rappaport v. Nichols, 31 N.J. 188, 203, 156 A.2d 1 (1959); Martin v. Bengue, Inc., 25 N.J. 359, 374, 136 A.2d 626 (1957); Vadurro v. Yellow Cab Co., 6 N.J. 102, 108, 77 A.2d 459 (1950). Likewise, as we have already pointed out, the duty of a manufacturer or distributor to attach an appropriate warning is not obviated by the obligation on the part of an employer to ensure that the appropriate and adequate warning is maintained.
Reversed and remanded for further proceedings.
NOTES
[1] According to defendant, Barry Szieber's real name is Barry Oates. For the purposes of this appeal we refer to him as Szieber.
[2] Various other parties named as defendants, specifically William Bowman Associates, Inland Leidy, Inc. and Enron Operations Corporation, were dismissed by summary judgment and are not the subject of this appeal.
[3] The stipulation of dismissal with prejudice is included in the appendix. Orders substituting Travelers, vacating the dismissal and/or amending the complaint have not been included in the appendix.