Town of Harvard *vs.* William Maxant.

Worcester. September 16, 1971. — November 9, 1971.

Present: Tauro, C.J., Cutter, Reardon, Quirico, & Hennessey, JJ.

*Zoning,* Private airstrip, "Customarily incidental" use. *Words,* "Customarily incidental."

Under a zoning by-law of a town "both permissive and prohibitive in form," use of land as a private airstrip was not allowed as a primary use where it was not included among the specified permitted primary uses, even though such use was not expressly prohibited. [434–436]

Use of property as a private airstrip was not allowed as an accessory use under a zoning by-law where there was no primary use of the property to which the airstrip could be an accessory use. [436]

Review of decisions containing the words "customarily incidental" and similar words in zoning ordinances and by-laws. [437–440]

Use of property in a town as a private airstrip for noncommercial purposes would not be permitted by the town's zoning by-law as "customarily incidental" to primary residential use of the property where such use as an airstrip had not been established as a common use in Massachusetts. [440]

Bill in equity filed in Superior Court on September 11, 1969.

The suit was heard by *Meagher,* J.

*Morris N. Gould (C. A. Peairs* with him) for the defendant.

*Morton C. Jaquith,* Town Counsel, for the plaintiff.

Quirico, J. This is a bill in equity brought by the town of Harvard (town) against William Maxant (defendant) to enjoin him from using or permitting the use of land owned by him for the landing or taking off of aircraft, which use is alleged to be in violation of the town's zoning by-laws. The defendant contends that this use of his property is lawful either as a permitted primary use or as accessory to a permitted use. The case is before us on the defendant's appeal from a final decree in favor of the town.

We have a report of all the evidence presented at the trial. It consists principally of oral testimony. The trial judge was not requested to file a report of material facts found by him. G. L. c. 214, § 23. However, he voluntarily filed a written decision which included detailed findings of facts. In this situation we "examine the evidence and decide the case according to our own judgment, accepting as true the findings of the trial judge, whether based wholly or partly upon oral evidence, unless they are shown to be plainly wrong, and finding for ourselves such other and additional facts as we deem to be justified by the evidence." *Sulmonetti* v. *Hayes*, 347 Mass. 390, 391–392. Accordingly, we summarize the facts as found by us and by the trial judge.

Prior to October 21, 1968,[1] the defendant spoke to the chairman of the town's board of selectmen about the proposed use by him and his son of two parcels of land in the town for an aircraft landing strip. One of the parcels was then owned by the defendant's son and it consisted of 14 acres. The other was an adjoining parcel consisting of 20.47 acres. The selectmen discussed the matter with the town counsel who gave them a written opinion on October 24, 1968, that the proposed use was not permitted by the town's zoning by-law (by-law). On October 28, 1968, the selectmen sent the defendant a copy of the opinion letter. On November 5, 1968, the defendant wrote the selectmen informing them that he had purchased the 20.47 acre parcel and that he wanted to make the announcement that he and his son would use a part of the parcel as "a personal landing strip" for landings and takeoffs by his and his son's personal planes. The defendant acquired title to the 20.47 acre parcel by a deed dated December 17, 1968, and recorded on December 30, 1968.

The defendant never applied for or obtained any permit from the town to use the property as a private landing field. He was not required to obtain any permit for the landing field

[1] The exact date the conversations started is unclear, but there is some evidence that they may have started as early as April, 1968.

from the Massachusetts Aeronautics Commission, but he was required to notify the Commission in writing that he was constructing or maintaining the field. G. L. c. 90, § 39B.[2] He gave such notice not later than January 10, 1969.

During the ten years before the defendant purchased his land, about fifteen acres of it had been used by a tenant for growing corn in the area now occupied by the defendant's airstrip. About one acre of the land contained apple trees. After the defendant purchased the land, he did some clearing, planting of clover and mowing in the area where the airstrip is located. He also placed some beehives in three places on the property. There was no building on the property when the defendant purchased it, but prior to the trial in the Superior Court he erected a structure which he used for storing agricultural equipment. His building permit application described this structure simply as a "storage building," but the defendant hoped to use it for storing his aircraft in winter.

The airstrip has been used for only six landings and takeoffs. Three were made by the defendant and three were made by his son, each piloting his own single engine plane. These landings and takeoffs involved no extraordinary noise, and neither caused nor resulted in any smoke, odor, fumes or mechanical disturbance. The defendant used the airstrip for his personal pleasure and recreation, and intended to continue to use it for that purpose. He and his son lived about five miles from the airstrip, the defendant in the town of Harvard, and his son in Ayer.

The by-law, at all times material to this case, divides the town into five types of districts: Agricultural-Residential (AR), Business, Commercial, Commercial-Industrial, and

---

[2] Section 39B, inserted by St. 1946, c. 607, § 1, provides in part that "no . . . airport, restricted landing area . . . shall be maintained or operated unless a certificate of approval of the maintenance and operation thereof is granted and is continued in force by the commission." However, it also provides that the section shall not apply "to restricted landing areas designed for non-commercial private use . . . provided, that each person constructing or maintaining a restricted landing area for non-commercial private use shall so inform the commission in writing."

Watershed Protection and Floodplain. The defendant's 20.47 acre parcel is in an AR district. The by-law prohibits certain described or specified "injurious, offensive, or otherwise detrimental" uses in all districts of the town.[3] The list of specified prohibited uses does not include airports, airstrips, landing strips or the storage of aircraft.

The by-law states that premises shall be used only as therein permitted, and that "[a]ny accessory use may accompany the main use." It defines the word "accessory" as follows: "An accessory use or structure is one clearly subordinate to, and customarily incidental to, and located on the same premises with the main use or structure to which it is accessory." It expressly prescribes and limits the uses which are permitted in each of the five types of zoning districts. Section 5.2 of the by-law provides that the uses permitted as of right in an AR district include one family residences, limited types of home occupations, the renting of rooms to nontransients, various forms of agriculture including housing for farm help and the sale of natural produce of the farm, and certain religious, educational, conservation or municipal uses. Additional limited uses are allowed subject to special permits or other approval required therefor. None of the uses permitted in an AR district, whether as of right or upon special permit or approval, includes airports, airstrips, landing strips or the storage of aircraft. Neither is any of such uses expressly permitted in any of the other four types of districts.

The defendant argues that since a private landing strip does not fall within any of the uses prohibited by § 5.1, it

---

[3] Section 5.1 of the by-law provides as follows: "5.1 GENERAL. No use is permitted which is injurious, offensive, or otherwise detrimental to the neighborhood or community because of a. concussion, vibration, noise, or other mechanical disturbance, b. Smoke, dust, odor, fumes, or other air pollution, c. glare, fluctuating light, or electrical interference, d. danger of fire, explosion, radioactivity, or other danger, or e. wastes or refuse (except at the Town Dump), or other characteristics. The customary character of normal farm operations permitted in the Bylaw is not considered detrimental. The collection or open storage of junk or abandoned autos, the commercial raising of swine or fur animals, the manufacture or commercial storage of explosives, a fertilizer plant, a slaughter house, or a race track are specifically prohibited."

follows that it must therefore be permitted in an AR district, and perhaps in all five of the zoning districts. We do not agree with this oversimplified reading of one section of the by-law without regard to the other sections. There is no requirement that zoning by-laws or ordinances follow any particular pattern or structure. They may take the form of prescribing uses permitted or prescribing uses prohibited, or a combination of the two. The town adopted a by-law which combines the two. It prohibits certain uses from all zoning districts of the town, and it also prescribes and limits the uses permitted in each district. This by-law is "both permissive and prohibitive in form." *Building Inspector of Chelmsford* v. *Belleville*, 342 Mass. 216, 217. The defendant's use is not made lawful solely because it is not prohibited by § 5.1 of the by-law. It must also be a use which is permitted in an AR district under § 5.2. Considered as the primary use made of the land, the private landing strip does not meet this test.

The defendant next argues that his use of the private landing strip is lawful because it qualifies as "customarily incidental" to the residential use of the property. If this issue is decided on the record which comes to us from the Superior Court the defendant is barred at the threshhold because on that record he made no residential use to which he could claim the private landing strip to be accessory. He gains nothing by resort to the by-law's provision permitting accessory uses since there is no use made of the property except for the landing strip. *Old Westbury* v. *Hoblin*, 141 N. Y. S. 2d 186 (N. Y. Supr. Ct.). See *Adley* v. *Paier*, 148 Conn. 84, 86; *Mahler* v. *Board of Adjustment of the Borough of Fair Lawn*, 94 N. J. Super. 173, 180, affd. 55 N. J. 1; *Mola* v. *Reiley*, 100 N. J. Super. 343, 348. Cf. *Baddour* v. *Long Beach*, 279 N. Y. 167, 175, app. dism. 308 U. S. 503. For the foregoing reasons, the final decree must be affirmed.

At the argument before this court the defendant offered a document entitled "Additional Argument Supplementing Brief for Appellant," stating that since the decision of the

case in the Superior Court he "has applied for and received a building permit and has in fact constructed a permanent residence which he now occupies as his domicile on the 20.47 acre parcel of land in Harvard which is the subject of this proceeding." The town agreed only that the permit had been issued. The additional facts thus offered cannot be placed before us by the unilateral action of the defendant. *Coonce* v. *Coonce,* 356 Mass. 690, 693, and cases cited. However, since the additional facts, if treated as properly before us, would not change the result, and because both sides have argued the question whether the private landing strip would be permitted as accessory to a residential use, we think that by expressing our opinion upon that question we may prevent further litigation between the parties. *Wellesley College* v. *Attorney Gen.* 313 Mass. 722, 731, and cases cited. *Simeone Stone Corp.* v. *Board of Appeals of Bourne,* 345 Mass. 188, 192.

For the purpose of the present discussion we are assuming that the defendant occupies a residence located on the same premises where the landing strip is located. The only question therefore is whether the use of the landing strip is "customarily incidental" to the residential use. A review of decisions construing these and similar words will be helpful.

In *Needham* v. *Winslow Nurseries, Inc.* 330 Mass. 95, 101, we said that "[a]n incidental or accessory use under a zoning law is a use which is dependent on or pertains to the principal or main use," and held that the sale of garden tools and equipment, the sale of certain merchandise not grown on the premises, and the use of the premises as the headquarters for a contracting business were not permitted as accessory uses to "greenhouses" and "nurseries." In *Pratt* v. *Building Inspector of Gloucester,* 330 Mass. 344, we held that the keeping of two show horses was not within any accessory use impliedly permitted in a residence district. We said, pp. 346–347, "When the question arises as to uses which in general tend to become deleterious to a neighborhood of homes it would seem that the most liberal test open to us

must be whether the use is one that is so necessary in connection with a one family detached house or so commonly to be expected with such a house that it cannot be supposed the ordinance was intended to prevent it. We do not believe that a stable for horses for family use could pass that test either as of 1927 when the ordinance was originally adopted or as of 1950 when it was reënacted. If the same question were presented as of the year 1900, for example, it is possible that a different answer would be required."

The following helpful discussion of the meaning of the words "subordinate and customarily incidental" in a zoning by-law provision for accessory uses is contained in *Lawrence* v. *Zoning Bd. of Appeals of North Branford,* 158 Conn. 509, 512–513.

"The word 'incidental' as employed in a definition of 'accessory use' incorporates two concepts. It means that the use must not be the primary use of the property but rather one which is subordinate and minor in significance. Indeed, we find the word 'subordinate' included in the definition in the ordinance under consideration. But 'incidental,' when used to define an accessory use, must also incorporate the concept of reasonable relationship with the primary use. It is not enough that the use be subordinate; it must also be attendant or concomitant. To ignore this latter aspect of 'incidental' would be to permit any use which is not primary, no matter how unrelated it is to the primary use.

"The word 'customarily' is even more difficult to apply. Although it is used in this and many other ordinances as a modifier of 'incidental,' it should be applied as a separate and distinct test. Courts have often held that use of the word 'customarily' places a duty on the board or court to determine whether it is usual to maintain the use in question in connection with the primary use of the land. See 1 Anderson, [American Law of Zoning § 8.26] loc. cit. In examining the use in question, it is not enough to determine that it is incidental in the two meanings of that word as discussed above. The use must be further scrutinized to determine

whether it has commonly, habitually and by long practice been established as reasonably associated with the primary use. . . .

"In applying the test of custom, we feel that some of the factors which should be taken into consideration are the size of the lot in question, the nature of the primary use, the use made of the adjacent lots by neighbors and the economic structure of the area. As for the actual incidence of similar uses on other properties, geographical differences should be taken into account, and the use should be more than unique or rare, even though it is not necessarily found on a majority of similarly situated properties."

The judge made no express finding of the factual issue whether a private landing strip is or is not "customarily incidental" to a residential use. No finding was required on the issue because he found that "there is no residence upon this land, nor is there any agricultural use conducted on the premises, . . . the respondent wants to use this landing strip for purely his personal use and for pleasure, . . . [and] the use of this air strip is not attached to any residential use or agricultural use of the premises in question."

The defendant relies in part on cases which have held such uses as tennis courts, swimming pools and amateur radio towers to be accessory to residential uses. *Wright* v. *Vogt*, 7 N. J. 1. *Skinner* v. *Zoning Bd. of Adjustment of the Township of Cherry Hill*, 80 N. J. Super. 380. *Bloomfield* v. *Parizot*, 88 N. J. Super. 181. *Hardy* v. *Calhoun*, 383 S. W. 2d 652 (Tex. Civ. App.). For additional citations and discussion of similar recreational uses held to be accessory to residential uses, see Rathkopf, The Law of Zoning and Planning (3d ed.) c. 23, § 36 at pp. 23–53 to 23–59, and Supplement thereto. We do not consider those cases applicable to the question before us.

Each of the parties has cited to us a decision in another State on the question whether a private landing strip is accessory to a residential use. The defendant relies on *Schantz* v. *Rachlin*, 101 N. J. Super. 334, affd. 104 N. J.

Super. 154, and the town relies on *Samsa* v. *Heck*, 13 Ohio App. 2d 94. In each case the zoning ordinance permitted accessory uses subordinate to the principal use and located on the same lot therewith. The ordinance in the *Schantz* case required that a claimed accessory use be "clearly incidental" to the principal use, whereas that in the *Samsa* case required that it be "customarily incident" thereto. Thus, the ordinance in the latter case was almost identical to that before us. In the *Schantz* case the court held the private landing strip use was permitted as accessory to a residential use, and in the *Samsa* case the court held that it was not. We consider the decision in the *Samsa* case more persuasive because of the similarity of the ordinance involved there to the ordinance before us.

In the case before us the defendant testified that his was the only private landing strip in the town of Harvard, and that he knew of none in adjoining towns. Even if we take notice of the increasing use of private aircraft as a means of business travel and transportation and for pleasure purposes, such use has not become so prevalent in Massachusetts that it can now be held that it is one "customarily incidental" to the residential use of property. See *Building Inspector of Falmouth* v. *Gingrass*, 338 Mass. 274, 276. This conclusion is limited to the factual situation presented by the record before us, and we intend no suggestion that a private landing strip may not some day become "customarily incidental" to a residential use.

*Decree affirmed.*