Fecteau, J.
This matter involves four actions consolidated for trial all of which relate to various applications of the parties for relief to the zoning officials of the Town of Southborough in connection with the construction and operation by Garabedian of his personal aircraft landing strip and airplane hangar, his intention to level off an additional area at the end to allow for an “over-run” area, and applications to add a second airplane hangar or to add onto his existing hangar to allow for expansion of storage capacity for additional aircraft on the property.
This matter came on for trial before me, sitting without jury, on January 18-20, 2000. The parties were granted leave, at their request, to file requests for findings of fact and rulings of law by February 11, 2000. Upon consideration of the credible evidence, I make the following findings of fact and rulings of law.
FINDINGS OF FACT
1. John H. Garabedian is a resident of the Town of Southborough and has been since approximately 1978, living at 24 Fairview Drive. In 1984, Garabedian wanted to construct a landing strip and build a hanger on land behind his house in a residential district in Southborough.[1] His property is zoned in the “RA” residential zone. Garabedian is a businessman.[2] He is the CEO of a radio network, located on Central Street in Southborough. He is also the host of a weekend evening radio program known as “Open House Party” which is one of the programs distributed over his radio network. As a hobby, Garabedian restores and flies older airplanes, sometimes known as “classic” and “antique” airplanes. He first obtained a pilot’s license in 1976 and purchased his first airplane in 1978 or 1979. He flies approximately 100 hours a year. (Garabedian testimony.) Prior to the construction of his own landing field, he primarily used the Marlborough Airport, approximately 6 miles away, for landings and storage of his plane although he sometimes used Hanscom and Norwood Airports.
2. In March 1984, he applied for permission from the Federal Aviation Administration (“FAA”) to build a private landing strip, and was granted such permission, subject to local municipal and environmental regulations. (Exs. 5, 9.) In his initial application with the FAA, he indicated that it was his intention to construct a grass landing field of approximately 1,800 *131 feet in length and 50 feet wide, with no lighting. He also anticipated that up to two single-engine aircraft(s) would be based there within 5 years. The FAA permission stipulated that operations were to be conducted between sunrise and sunset only in VFR (visual flight rules) weather and visibility conditions.
3. Thereafter, he met with the Southborough building inspector who was then aware of at least three other private, turf landing strips in Southborough. In addition, one such owner also had a hangar, converted from the ground level of a barn. The building inspector in turn spoke with town counsel, and was orally advised that he could issue a permit for a hangar, as Garabedian’s use of land for a private landing strip was recognized in Southborough as an accessory use to the principal use of a residence. The building inspector determined that no permit was needed for a landing strip. (Garabedian, Phaneuf testimony.) Therefore, no building permit was applied for or obtained for the airfield.
4. On September 11, 1984 Garabedian applied for a building permit for the hangar. (Ex. 7, 8.) The application form in use had several pre-printed proposed uses and a final box marked as “other.” After discussing with the building inspector how to fill out the application, Garabedian checked the “other” box and wrote in “barn” on the application, likely a result of the inspector’s prior experience with the converted barn/hangar. Although his actual proposed use of the structure as an airplane hangar was not identified within the application for a building permit, Garabedian forwarded to the building inspector, at his request, copies of FAA materials. (Ex. 10.) Garabedian’s November 7, 1984 cover letter enclosing these documents might be considered as referring only to the “open space non-commercial” use regulations in Section IV, (a)(1) of the zoning by-laws (Ex. 1, p.7). Garabedian’s attorney followed up Garabedian’s November 7, 1984 letter with a letter dated November 19, 1984, making reference to Garabedian’s “recreational” use of the landing strip which is also referred to in Section IV, (a)(1) of the zoning by-laws. (Ex. 37.) The FAA documents sent by Garabedian to the building inspector were placed by him in the building permit file that he opened regarding this property.
5. Garabedian started work on the landing strip in the summer of 1984. (Westland testimony.) In the fall of 1984, after receiving the building permit, he started excavating and poured foundations for the barn/hangar before the winter. The airfield was usable in the fall of 1984. The building was completed the next spring. (Garabedian, Westland testimony.) The building inspector inspected the work in progress, but did not issue an occupancy permit. It was his practice not to issue occupancy permits for accessory structures on residential property. (Phaneuf testimony.) The building was wood-frame with a metal exterior.
6. Before starting the project, Garabedian had spoken to some, but not all, of his neighbors.[3] After work started, one neighbor, Ross, questioned whether a landing strip was legal. (Testimony of Garabedian, Westland.) In response to questions raised by neighbors, in December 1985, the Board of Selectmen asked for a written opinion from Town Counsel. (Ex. 44.) Town Counsel advised that a private airstrip was not allowable as a primary use, but was in his opinion a recognized accessory use in Southborough, as there were other private airstrips in Southborough which had been used for more than twenty years as incidental to a principal use. (Ex. 38.)
7. From the Town Counsel’s ruling, in 1985 until early 1996, Garabedian restored and flew his planes without incident of any kind, including any zoning complaints. Specifically, there was no evidence that any requests were made to the building inspector until March 1996, to enforce the zoning ordinance by ordering Garabedian to cease and desist his use of the landing strip and hangar. During that period, he increased his collection of planes, and now owns ten planes, with seven customarily stored in Southborough. (Garabedian testimony.) After the initial construction of the airstrip, he paved over the center 30 feet of the landing strip to eliminate the danger of rocks hitting his propeller and ruts developing in the landing strip. He also applied for and received amendments to his FAA permission to allow for the installation of low intensity lights so that he could land in the evening. The paving was done during the summer of 1985 and the lights were added within the first five years of use. He did not inform or seek permission from the building inspector for either of these improvements. These changes were reflected in the various forms filed with the FAA and with the Massachusetts Aeronautics Commission. (Garabedian testimony; Exs. 11, 13, 14, 30, 39.) While there appear to be inconsistencies on some of the earlier forms as to the number of monthly landings (contrast Exs. 5, 13, with Exs. 14, 30), Garabedian flew about 100 hours each year within a customary range of between 200 to 300 miles. (Garabedian testimony.)
8. In the 1990s, Garabedian also built a private landing strip and a hangar at his vacation home in Vermont. At present, he is in the process of building a second vacation home with a hanger, in Falmouth, in a subdivision adjacent to a landing strip which is used by all residents of the subdivision. (Garabedian Testimony. ) It is uncontroverted that Garabedian’s current use of the landing strip in Southborough is approximately the same as the use in 1985, notwithstanding the increase in the number of planes he owns. (Testimony of neighbors.)
9. The land at the southeasterly end of Garabedian’s Southborough landing strip drops off. In August 1995, Garabedian made an arrangement with a local contractor to dump fill at that end of the *132 runway. This was intended to make his land more useable, and to give him additional “run out” space on landings. (Garabedian testimony; Exs. 15, 33.)
10. For several months in the fall of 1995, the contractor brought fill onto the property without any zoning issues being raised by the Town or by the neighbors. However, the contractor did encounter some problems with some neighbors who were upset with his trucks coming into the neighborhood. These trucks, consisting primarily of 18-wheel gravel haulers, were making 40-50 trips per day, often uncovered, and caused noise, odors, vibration and other unpleasant aspects of hauling fill through a residential neighborhood. In addition, due to the narrow entry onto Garabedian’s land, several trucks would often be stopped on Fairview Drive idling while waiting their turn to enter and dump their fill. The neighbors complained to various town and state officials, which resulted in equipment inspections by the State Police Truck Unit. The contractor corrected all problems with the equipment to the satisfaction of the State Police Truck Unit, and continued hauling operations until severe winter weather stopped the work. (Testimony of neighbors.)
11. The neighbors also arranged for a site inspection by the Department of Environmental Protection which determined that some of the materials brought onto the site included concrete rubble and rebar, which are not “clean fill.” The contractor recognized that this was his responsibility and removed those materials. (Garabedian testimony; Exs. 40, 41,42, 44, 45.)
12. One of the neighbors, Michael Johnston(“Johnston”), went onto Garabedian’s property to confront the workers. He also confronted the contractor and workers as they were hauling fill and equipment onto the site. He used his Channel 7 professional video camera to film the activities, provoking loud and rude comments from the workers. Johnston knew that the workers viewed his actions as harassment. Ultimately, there was a physical confrontation. Garabedian was not involved in these actions. Indeed, Johnston was critical of Garabedian for not responding to Johnston. (Johnston testimony.) Johnston picketed the site, and harassed the contractor and Garabedian’s workmen. One of the neighbors claimed to have been assaulted. The contractor ceased operations for a while during the winter. When Garabedian began to work on the property again in February 1996, the neighbors protested vigorously. On February 28, 1996, the building inspector issued an order to Garabedian to cease and desist from the bringing of fill onto his land. Garabedian appealed that order to the Zoning Board of Appeals for the town, which, on June 19, 1996, the board affirmed. Concurrently with his appeals from this cease and desist order Garabedian filed an action in this court, under civil action docket no. 96-0558, seeking a judgment that declared his rights to bring fill onto his property without restriction.
13. During the winter of 1995-96, Garabedian decided that he needed additional hangar space for his growing collection of aircraft, which had increased to 10. Although he was storing three planes in Vermont, it was an isolated location, and subject to vandalism, thus he wanted to have all of his collection in Southborough. He decided to build an additional hangar on the southerly side of the landing strip. On February 7, 1996, Garabedian applied for a building permit for the second hangar. (Garabedian testimony,Ex. 16..) On March 1, 1996. the building inspector for the Town of Southborough, a different person than the one who had granted his permit for his first hangar in 1984, denied the application on the ground that a second hangar was not incidental or subordinate to the principal use of a residence under the zoning by-law. Garabedian appealed the denial of this building permit to the Zoning Board of Appeals, which, on June 19,1996, the same date that it affirmed the cease and desist order of the building inspector regarding the “filling” of his land, affirmed the denial of the building permit. Garabedian filed suit in this court in connection with these two decisions, under civil action docket no. 96-1462.
14. On March 11, 1996, Mary Westland (“West-land”), a neighbor of Garabedian, together with other neighbors, sent a letter to the building inspector of the town, seeking the enforcement, under G.L.c. 40A, §7, of the zoning by-laws, challenging the use of the barn and landing strip as not permissible as accessory uses in a residential district. I infer that this was the first time that any neighbor made any such complaint. Moreover, I infer that the complaint was motivated or prompted primarily by the trucking activity since neither she nor any other neighbors had made any such complaint regarding the landing strip prior thereto. Receiving no response, Westland again wrote to the building inspector seeking an order to require Garabedian to stop using the airfield. The inspector responded to this latter request stating that he believed the statute of limitations had run on the issue of the use of the landing strip. The neighbors appealed both this decision and the failure to respond to the earlier request for enforcement of the zoning ordinance to the board, which affirmed the decisions of the inspector on June 11, 1996. The neighbors then filed suit in this court under docket no. 96-1386.
15. On November 8, 1996, Garabedian submitted an application to the building inspector for a building permit to extend his existing hangar by an area of 104 feet by 48 feet. On November 15, 1996, the application was denied. An appeal was taken to the Zoning Board of Appeals, which, on February 5, 1997, filed its decision to affirm the building inspector. The decision was based on a finding that to expand the hangar by the proportion sought was to make the hangar no *133 longer incidental nor subordinate to the principal use of the land, that being a residence. Garabedian then filed the fourth of four cases presently before the court and consolidated for trial, under docket no. 97-0388.
16. The Southborough Zoning By-laws define accessory building or use as “a building, structure, or use customarily incidental and subordinate to the principal permitted use of building or land, located on the same lot as the principal permitted building or use, and not prohibited by this chapter.” (Ex. 2, p. 17404, §174-2(B).) There is no specific prohibition in the by-laws against a private landing strip, nor is a landing strip expressly permitted as a primary or accessory use in any district. The by-laws further provide that any use permitted in a Conservation District is permitted in a Residence A district. (Ex. 2, p. 17417, §174-8.2(A)(1).) The Southborough Zoning by-laws provide that open space, noncommercial recreation is a permitted use in a Conservation District. (Ex. 2, p. 17416, §174-8.1(A)(1).)
RULINGS OF LAW
All of the four actions consolidated for trial and considered here relate to decisions of the zoning officials of the Town of Southborough from which appeals have been taken to this court pursuant to G.L.c. 40A, §17. Garabedian contends that his landing strip, his original airplane hangar and either a second hangar or an enlargement of his original hangar are all accessory uses of the principal use of his property as a residence, that he is entitled to continue to use his landing strip and hangar as he has been since 1984, and that he is entitled to build any number of accessory buildings and/or any size building so long as he conforms with the height and land coverage máximums. His neighbors contend otherwise. They oppose, as violations of the zoning ordinance, not only any addition to his existing hangar and/or the construction of any other hangars, but also seek an order that enforces the zoning ordinance by prohibiting his use of the landing strip and an order that vacates the grant of the building permit for the construction of his original hangar.
In action no. 96-1462, Garabedian appeals the decisions of the Zoning Board that he cannot fill his land[4] and that only one building can be constructed for accessory use to residential land (i.e. appeal of Zoning Board’s decision to deny permit to build a second hangar). Similarly, in action no. 96-0558, Garabedian seeks a declaratory judgment against the Town of Southborough for the right to bring fill onto his property.[5] His neighbors have appealed, in docket no. 96-1386, from the denial of their request to the building inspector, made pursuant to G.L.c. 40A, §7, to enforce the zoning ordinance by ordering Garabedian to cease and desist from the use of his private landing strip as it is alleged to be in violation of the zoning ordinance, and to vacate the building permit that had been granted to Garabedian for the construction of his existing airplane hangar, as they allege that both are not permissible accessory uses in Southborough. In docket no. 97-0388, Garabedian appeals from the Zoning Board’s denial of a building permit for constructing an addition to his existing hangar. The scope of review by this court is to hear the matter de novo, find the facts and determine the validity of the decisions of the board upon those facts. Pendergast v. Board of Appeals of Barnstable, 331 Mass. 555, 558-9 (1954).
With the exception of the declaratory judgment action that involves the trucking of fill onto Garabedian’s land, the other actions require a determination of the nature and scope of an “accessory use” to the principal use of residential property. This court must determine whether a private airplane landing strip and hangar are such accessory uses, and whether such uses can be expanded by additional uses and/or by additional or larger buildings serving these accessory uses. Also at issue with respect to the abutters’ appeal is the application of the statute of limitations to the use and construction that was permitted as of 1984.
I. Statute of Limitations
The first issue is whether the abutters’ action is barred by the relevant statute of limitations set forth in G.L.c. 40A, §7. This analysis requires a separate consideration of the landing strip from the hangar since the landing strip was built without any permit, whereas the hangar was built pursuant to a permit.
(A.) Landing Strip[6]
Although the FAA gave Garabedian permission for a landing strip, he neither applied for nor Was he issued a permit by the town of Southborough. In contrast to the findings of this court, the Southborough building inspector, in 1984, determined no permit was needed for a landing strip and thus no permit was applied for or obtained for it. Pursuant to G.L.c. 40A, §7, the statute of limitations for bringing an action, suit, or proceeding in any court for violations of zoning regulations without a permit is as follows: *134 (1991). The ten-year statute of limitations for violations not authorized by a permit clearly only applies to “structures,” not uses. This is evident because the statute does specifically state that violations authorized by a permit cover both “structural violations or use violations.” G.L.c. 40A, §7. In Lord v. Zoning Board of Appeals of Somerset, the court concluded that the building permit for an addition to the house did not signal that the house would be used as a two-family house. Therefore, the court held that use of the house as a two-family dwelling, not in accordance with the terms of the original building permit,[7] was a use in violation of zoning regulations and was not protected by G.L.c. 40A, §7.
*133 ... no action, criminal or civil, the effect or purpose of which is to compel the removal, alteration, or relocation of any structure by reason of any alleged violation of the provisions of this- chapter, or any ordinance or by-law adopted thereunder, or the conditions of any variance or special permit, shall be maintained, unless such action, suit or proceeding is commenced and notice thereof recorded in the registry of deeds for each county or district in which the land lies within ten years next after the commencement of the alleged violation.
*134 Since there was no permit for the private landing strip, the court finds that the relevant statute of limitations to be applied is the ten-year statute of limitations. The ten-year statute of limitations though, is only applicable to structures. Pursuant to this court’s rulings of law, see infra, in which this court determines that a landing strip is not a structure for the purpose of zoning requirements, this court finds that the action before this court in regard to the private landing strip is not barred by a statute of limitations.[8]
(B.) Hangar
As for the original hangar, a permit was issued by the building inspector. The neighbors contend that since the application did not reference the actual intended use as an airplane hangar, but instead described the use as a barn, the public was misled and the applicable statute of limitations should be tolled. However, the building inspector’s file for this location also contained copies of correspondence from the FAA and Massachusetts Aeronautics Commission. Moreover, the neighbors knew immediately what Garabedian’s use of the property was going to be as soon as he flew his first plane onto the property and first started to store the plane in the hangar. Thus, this court finds that G.L.c. 40A, §7 is applicable. In pertinent part, the statute states:
... if real property has been improved and used in accordance with the terms of the original building permit issued by a person duly authorized to issue such permits, no action, criminal or civil, the effect or purpose of which is to compel the abandonment, limitation or modification of the use allowed by said permit or the removal, alteration or relocation of any structure erected in reliance upon said permit by reason of any alleged violation of the provisions of this chapter, or of any ordinance or by-law adopted thereunder, shall be maintained, unless such action, suit or proceeding is commenced and notice thereof recorded in the registry of deeds for each county or district in which the land lies within six years next after the commencement of the alleged violation of law.
G.L.c. 40A, §7 (emphasis added).
The original building permit for the hangar was issued in the fall of 1984. The plaintiffs allege that the hangar is not a permissible accessory use in a residential district. This use began in the fall of 1984. The earliest action was brought in 1996. As any actions in court must be commenced within six years after the alleged violations commenced, this court finds that the plaintiffs’ claims against Garabedian relating to the original airplane hangar are barred by the relevant statute of limitations. As these actions are barred, this court will not address whether the original hangar was an appropriate accessory use to residential property.
II. Accessory Use (A.) Standard
G.L.c. 40A, §7, states, in relevant part, that:
[T]he inspector of buildings . . . shall be charged with the enforcement of the zoning ordinance or by-law and shall withhold a permit for the construction, alteration or moving of any building or structure if the building or structure as constructed, altered or moved would be in violation of any zoning ordinance or by-law; and no permit or license shall be granted for a new use of a building, structure or land which use would be in violation of any zoning ordinance or by-law. If the officer or board charged with the enforcement of zoning ordinances or bylaws is requested in writing to enforce such ordinances or by-laws against any person allegedly in violation of the same and such officer or board declines to act, he shall notify, in writing, the party requesting such enforcement of any action or refusal to act, and the reasons therefor, within fourteen days of receipt of such request.
The zoning ordinance describes its applicability, in Section IV, Subsection 1, as follows:
No land in any district shall hereafter be used or occupied and no building and land shall be altered, except as set forth in the following Schedule of Use Regulations or as specifically regulated or provided otherwise under other sections hereof provided that the accessory uses and buildings not enumerated in the Schedule but necessarily or customarily incidental to a principal use, including the signs otherwise allowed shall be deemed to fall into the same category as the principal use.
The Southborough Zoning By-laws define accessory building or use as a “building, structure, or use customarily incidental and subordinate to the principal permitted use of building or land, located on the same lot as the principal permitted building or use, and not prohibited by this By-Law.” Southborough Zoning By-Laws, Section II. The ordinance is silent as to private, non-commercial landing strips and airplane storage hangars; they are neither specifically permitted nor prohibited. The zoning ordinance of the town is, in general, both permissive and prohibitive. However, the fact that the ordinance does not specifically *135 prohibit a use does not necessarily mean that all other uses are permitted.
Other uses are permitted aside from those explicitly allowed "if it may be said to be accessory to a use that is expressly permitted.” Town of Salem v. Durrett, 125 N.H. 29, 32 (1984) (the court did not examine whether the accessory use of the attorney’s home as an office was customary because such use is explicitly allowed in the zoning ordinance). “Generally speaking, an accessory use needs to be both customary and incidental. See Harvard v. Maxant, 360 Mass, at 438. Courts consider the question of whether a particular' use is customary where the zoning ordinance does not specify what types of uses are permitted.” Cunha v. City of New Bedford, 47 Mass.App.Ct. 407, 411, FN5 (1999) (emphasis supplied). In the case of Pratt v. Building Inspector of Gloucester, 330 Mass. 344(1953), the court, in considering the application of a homeowner for the construction of a stable, said:
[e]ven though the ordinance does not expressly permit accessory uses, it must of course be construed in a reasonable manner, always with regard to the obvious intent of maintaining the character of the neighborhood as appropriate for one-family detached houses. For example, we have no doubt that a part of a lot might be devoted to a garden for use in connection with the house. But when we begin to deal with a stable, especially since it involves a building on the land which is not a dwelling house, we must consider in what direction we are being led. If Milne [the homeowner] can keep two horses, can he keep three or five for the same purpose? . . . When the question arises as to uses which in general tend to become deleterious to a neighborhood of homes it would seem that the most liberal test open to us must be whether the use is one that is so necessary in connection with a one-family detached house or so commonly to be expected with such a house that it cannot be supposed the ordinance was intended to prevent it.
Id. at 346r47.
In Maxant, the court considered the definitions of “subordinate,” “incidental” and “customarily,” borrowing on the analysis of the Connecticut Supreme Court in the case of Lawrence v. Zoning Board of Appeals of North Branford, 158 Conn. 509, 512-13 (1969). The word “incidental" was found to mean that the use could not be the primary use of the land, but rather one that was subordinate and minor in significance, as well as having a reasonable relationship with the primary use. Harvard v. Maxant, 360 Mass. 432, 439 (1971) (private airstrip not considered to be customarily incidental to primary use of property as a residence); Cunhav. City of New Bedford, 47 Mass.App.Ct. at 411. To determine whether the use is incidental to the primary use, the court may consider whether the incidental use “bear[s] a close resemblance and obvious relation to the main use to which the premises are put.” Tanis v. Township of Hampton, 306 N.J.Super. 588, 604 (1997) (holding that even if landing strip was incidental to primary use, it is not customary).[9]
“Customarily” commends consideration of whether it was usual to maintain the proposed use in connection with the primary use, taking into account “the size of the lot in question, the nature of the primary use, the use made of adjacent lots by the neighbors and the economic structure of the area. As for the actual incidence of similar uses on other properties, geographical differences should be taken into account and the use should be more than unique or rare, even though it is not necessarily found on a majority of similarly situated properties.” Harvard v. Maxant, 360 Mass, at 439. Not only must the accessory use be “ ‘habitually . . . established as reasonably associated with the primary use’ . . . [but] a rare association of uses cannot qualify as customary, though the uses need not be joined in a majority of instance of the principal use.” Town of Salem v. Durrett, 125 N.H. at 32-33 (holding that one instance of a similar customary use of a private airstrip as an accessory use to residential property does not constitute “custom”).
(B.) Landing Strip
At the time of Garabedian’s original permit application in 1984, the building inspector of the town was of the belief that a private landing strip did qualify as an accessory use in a residential zone, as the town had prior experience with that use on at least two or three other occasions. Although interpretation of a zoning by-law is in the last analysis a judicial function, deference is owed to a local zoning board’s homegrown knowledge about the history and purpose of its town zoning by-law. In Pendergast v. Board of Appeals of Barnstable, 331 Mass. 555 (1954), the court stated that “zoning has always been treated as a local matter.' The creation and modification of zones are matters of municipal legislation. The board of appeals is a local board familiar with local conditions.” Id. at 557. However, “[t]he right of the public to have the zoning by-law properly enforced cannot be forfeited by the action of its officers.” Cullen v. Building Inspector of North Attleborough, 353 Mass. 671, 675 (1968).
Even where there has been a substantial financial investment, laches or estoppel is not typically a defense to an action to enforce municipalities’ by-laws or zoning ordinances. Cape Resort Hotels, Inc. v. Alcoholic Licensing Board of Falmouth, 385 Mass. 205, 224 (1982). However, the Supreme Judicial Court has applied the laches theory and permitted the use of laches as a defense against a Zoning Board. Chilson v. Zoning Board of Appeal of Attleboro, 344 Mass. 406, 409-10 (1962) (holding that “the rule that a municipality may not be estopped or barred by laches is inapplicable”[10]). In Chilson, upon the neighbors’ filing of the petition, Chilson had been using the non-conforming use which was approved by the inspector of buildings for nine (9) years. The Court held that “it *136 would be unjust and unreasonable to upset the informal decision of the enforcing officer in respect thereof in this suit by owners of other property in the neighborhood." Id. at 409.
Although in Chilson the owners of the property were asking that their non-conforming use not be disturbed, and in the case currently before this court the neighbors are seeking to overturn the Zoning Board of Appeals decision, the principle underlying these cases is similar. Accordingly, the court finds that just as in Chilson, in this case, the rule that a municipality may not be barred by laches is inapplicable; therefore, it is appropriate to consider Garabedian’s claim that the action by his neighbors is barred by the defense of laches.
As the defense of laches is available to Garabedian, and as he properly plead this affirmative defense in his Answer to the Complaint, this court finds that the neighbors’ demand for enforcement of the zoning bylaw to bar Garabedian’s use of his landing strip is itself barred by laches. Many of the plaintiff-neighbors knew at least by the summer of 1985 of Garabedian’s use of the landing strip. It was not established whether any of these plaintiff-neighbors complained to the Board of Selectmen in 1985, but the evidence did allude to citizen complaints. For the neighbors to wait eleven years before filing a complaint is an unreasonable delay, especially given the prejudice to Garabedian in both time and money. It would be unjust and inequitable to permit the neighbors’ action to continue. Therefore, the plaintiffs’ claims are DISMISSED and Garabedian may continue to use his landing strip pursuant to the decision of the building inspector in 1984 that the landing strip qualified as an accessory use, and the 1996 decisions of the building inspector and the Zoning Board of Appeals that he may continue such use.
For purposes of completeness, assuming arguendo that laches was inapplicable, the court must examine the current case law to review this case de novo. The Maxant case, supra at 17, also involved the use of land in a residential zone for a private landing strip. The court found, on the facts of that particular case, that the use of private aircraft had not become so prevalent in Massachusetts that such use was customarily incidental to the residential use of property. The applicant therein knew of no private landing strips in the Town of Harvard nor in any adjoining towns. The conclusion reached by the court was expressly limited to the factual situation presented therein and the court intended “no suggestion that a private landing strip may not someday become "customarily incidental" to a residential use." Id. at 440.[11]
The finding in Maxant was an evolution of a theme that had been earlier developed in the case of Building Inspector of Falmouth v. Gingrass, 338 Mass. 274 (1959). This case involved the intended use of a storage building for a seaplane on residential property that fronted upon a lake that was intended by the property owner to be used for landing and takeoff. The local zoning by-law had made a classification, found by the court to be reasonable, for the use of land for “airports and landing strips and the buildings or structures necessary thereto” in agricultural, business, light and heavy industry districts, but not in residential. The court noted that:
. . . even when maintenance of private airplanes has become a common and usual occurrence in Massachusetts it will by no means necessarily follow that reasonable classification will require that each owner be allowed to keep his plane on his own land. Perhaps the time will come when there will be force in the contention that it is unreasonable to bar an owner whose residential lot, ample in size, adjoins a landing field or water surface, which the owner may lawfully use for ascent or descent, from storing his plane on his own property. We intend no such suggestion. The well known properties of airplanes, the concomitants of their use, and the uncertainties still existing as to the effect on the community of the general use of private planes, now in its early stages, amply support the restrictions which this by-law imposes.
Id. at 277.
The building inspector, having decided in 1984 that a landing strip was an accessory use to the principal use of a residence, went on to decide that a building permit was unnecessary for the construction of the landing strip, due to the fact that it was obviously not a building and likely not a “structure.” A building permit is required to construct, reconstruct, alter, remove or demolish a building or structure, or to change the use or occupancy of a building or structure. 780 CMR 110.1. Although “structure” is defined therein as “that which is built or constructed or a portion thereof,” 780 CMR 202, cases that have interpreted the word in relation to the application of zoning requirements for uses such as swimming pools, tennis courts and basketball courts have often looked for minimum elements of a three-dimensional structure and the use of building materials, Chwaliszewski v. Board of Appeals of Lynnfield, 29 Mass.App.Ct. 247, 251 (1990), and excluding therefrom driveways and patios. The physical tasks that would likely be necessary for the “construction” of a landing strip can hardly be called “construction” in the sense of a building. As originally planned and finished, the landing strip was a turf or gravel surface. A landing strip is not a “structure” as it is more like a driveway than a swimming pool or a basketball court.
Accordingly, and although this court agrees with the interpretation by the building inspector in 1984 that a building permit was not necessary for the construction of the landing strip, this court must find, based on the facts of this case, that the private landing strip is not a proper accessory use to residential *137 property. In light of the case law and this court’s analysis of the facts of this case, this court finds that “at least three other private all turf landing strips in Southborough” is not enough to constitute commonality of private landing strips in residential districts. Therefore, private landing strips in Southborough are not a customarily incidental use to primary residential use of the land. Thus, if the defense of laches was held to be inapplicable, the decision of the Zoning Board that the construction and use of the landing strip for personal airplanes is a recognized accessory use to residential land must be REVERSED.
(C.) Existing Hangar
The Appeal by the neighbors from the decision of the Zoning Board which upheld the Building Inspector’s decision that the hangar is a recognized accessory use is barred by the statute of limitations. Accordingly, the existing hanger is an appropriate use and Garabedian may continue to use it. Thus, the decision of the Zoning Board of Appeals is AFFIRMED.
(D.) Addition to/Expansion of Hangar
Although this court found that the neighbors’ appeal from the Zoning Board’s decision that the initial hangar is a recognized accessory use is barred by the statute of limitations, Garabedian’s appeal from the Zoning Board’s decisions regarding an expansion to the hangar or the addition of a hangar is not barred by any statute of limitations. Pursuant to the aforementioned discussion on accessory uses relative to the landing strip, this court finds that the airplane hangar, or any addition or expansion thereto is not an appropriate accessory use to the property as it is neither customary nor incidental to the residential use of the property. According to the plaintiffs’ briefs, there was only one other hangar used for the storage of planes in Southborough in 1984 and only one other has been constructed since then. Therefore, the use of a hangar is not “more than unique or rare.” Harvard v. Maxant, 360 Mass, at 439. Although Southborough does not have limitations on the height of a building, particularly a barn, used as an accessory use to residential property, this court shall not address whether an expansion of the current barn/hangar would be appropriate since this court finds that the current barn/hangar is not an appropriate accessory use to the property.
Pursuant to Garabedian’s appeals, this court finds as a matter of law that the Zoning Board’s denial of Garabedian’s application for a permit to build a second hangar was appropriate.[12] Moreover, this court also finds that the Zoning Board’s denial of Garabedian’s application for a building permit to expand the hangar was likewise appropriate.
III. Declaratory Judgment — Right to Bring Land Fill onto Property
Garabedian seeks a declaratory judgment as to the unrestricted right to bring fill onto his property. This court, Donahue, J., allowed a special motion to dismiss, filed on behalf of the neighbors, pursuant to the provisions of G.L.c. 231 §59H, the anti-SLAPP statute, and that ruling shall not be disturbed [6 Mass. L. Rptr. 586]. Thus, this declaratory action is solely against officials of the Town of Southborough. In light of the final partial summary judgment allowed by this court, Ball, J., with respect to Count II in action no. 96-1462 which essentially reversed the cease-and-desist order of the building inspector and thus permitted Garabedian to bring fill onto his property without restriction, there is no new or different issue for this court to currently decide. As said grant of partial summary judgment by Ball, J. in civil action no. 96-1462 amounts to a decision between the only parties that remain in action no. 96-0558, which decision having been reduced to a separate and final judgment and is now on appeal at the Appeals Court, there no longer exists a case or controversy between the parties that necessitates any further judgment of the court. The complaint for a declaratory judgment shall be dismissed as moot or unnecessary.
ORDER FOR JUDGMENTS
Therefore, for the foregoing reasons, judgments shall enter as follows: in civil action no. 96-0558, a judgment shall enter that DISMISSES the complaint as moot; in civil action no. 96-1386, a judgment shall enter that AFFIRMS the decision of the Zoning Board of Appeals for the Town of Southborough denying enforcement relief to the applicants; in civil action no. 96-1462, a judgment shall enter on count I that AFFIRMS the decision of the Zoning Board of Appeals for the Town of Southborough denying the application for a building permit; in civil action no. 97-0388, a judgment shall enter that AFFIRMS the decision of the Zoning Board of Appeals for the Town of Southborough denying the application for a building permit.

Garabedian does not claim that his right to use his land for a landing strip and airplane hangar is a pre-existing, non-conforming use. Although the relevant zoning ordinance was enacted in 1984, it pre-dates his first discussions with the building inspector/zoning enforcement officer of the town.

Although he acquired three separate parcels at three different times, they are contiguous. He acquired the lot on which his house was built first, and it is a conventional, rectangular-shaped houselot for that neighborhood. After-wards he purchased the land on which he “constructed” his landing strip, a long, narrow land-locked strip of land that adjoins his houselot at its southern boundary and extends westerly, generally perpendicular to his houselot. His hangar is near the line which separates these lots.

Among the neighbors who testified were: Maiy Westland, plaintiff in civil action no. 96-1386, and a neighbor since approximately 1982, with one house between her and Garabedian; the Capobianco’s, also plaintiffs in said action, who are abutters and have resided next door to Garabedian since 1978; the Vasilopoluses, two houses away from Garabedian since approximately 1983; and Johnston, a neighbor who has lived across a side street from Garabedian since about 1990. Garabedian and Mary Westland agree that he did not speak with her prior to his application or construction. However, *138 and with the exception of Johnston, these neighbors became aware, almost immediately, when Garabedian began to use his landing strip in the fall of 1984, and all neighbors present at that time knew, certainly by the summer of 1985, that he was flying small aircraft on and off of his landing strip.

Since a separate and final partial judgment, which essentially overturns the cease and desist order that prevents Garabedian from bringing fill onto his property, has already been entered based upon a grant of summary judgment by Ball, J., and an appeal of that judgment has been taken, there is no further action necessary for this court to take with respect to that count.

Pursuant to footnote 4, this court finds that Garabedian’s request for a declaratory judgment for the right to bring fill onto his property is moot as a separate and final partial judgment has already been entered on this issue in civil action no. 96-1462. See infra at 25.

See infra at 19 for discussion on the applicability of laches.

This court recognizes that “original building permit” means “the first permit issued with respect to a particular improvement of real property.” Cape Resort Hotels, Inc. v. Alcoholic Licensing Bd. of Falmouth, 385 Mass. 205, 218 (1982).

Garbedian claims that the six-year statute of limitations applies because the statute protects the use of real property as a whole, not just the structure. Garabedian is correct that according to Cape Resort Hotels real property does refer to both land and buildings; however, the statute of limitations is only applicable if said real property or land has “been improved and used in accordance with the terms of the original building permit.” Cape Resort Hotels, Inc. v. Alcoholic Licensing Bd. of Falmouth, 385 Mass, at 218. For example, changing the use of a room is an improvement used in accordance with the residential use of property, but paving a landing strip next to an airplane hangar is not. Although this court finds that the six-year statute of limitations is inapplicable pursuant to Lord v. Zoning Board of Appeals of Somerset, 30 Mass.App.Ct. 226, 227 (1991), the landing strip is still impermissible because it is not a permissible accessory use.

“While not determinative, it is instructive that our research reveals no jurisdiction that has deemed such a landing strip an implied accessory use in a residential, commercial, or industrial zone. See also Redington Ranch Associates, supra; Samsa v. Heck, 13 Ohio App.2d 94, 234 N.E.2d 312 (1967). Cf. Town of Brookhauen v. Spadaro, 204 A.D.2d 533, 612 N.Y.S.2d 175 (1994); Twp. of Millcreek v. Hurst, 27 Pa.Cmwlth. 85, 365 A.2d 896 (1976); Clackamas County v. Portland City Temple, 13 Or.App. 459, 511 P.2d 412 (1973). These cases reason that even if a landing strip is incidental to the main residential use, it cannot be deemed customary.” Tanis v. Township of Hampton, 306 N.J.Super, at 608.

Although the Supreme Judicial Court has not found laches to be applicable to a municipality since the Chilson case, the Court has acknowledged in recent opinions that in certain cases, this may be the appropriate rule of law to follow. See Dresser v. Inspector Buildings of Southbridge, 348 Mass. 729 (1965) (holding that as there was no delay shown or inferable the court will not even address whether the principle of Chilson could be applicable); see also Cape Resort Hotels, Inc. v. Alcoholic Licensing Bd. of Falmouth, 385 Mass. 205, 224-25 (1982) (distinguishing the Court’s ruling in Chilson by stating that in that case, the Court found that the non-conforming use was “colorably within the exemption applicable to nonconforming uses”).

The Appellate Division of the New Jersey Superior Court found that in New Jersey, private landing strips were exceptionally unusual. At the time of the Tanis case, in 1995, only sixty to eighty landing strips were licensed in the entire state. In contrast to these figures, in 1968 when the Shantz case was decided there were eighty licensed private landing strips in the case. The court in the Tanis case determined that since “there has been no increase, and possibly a significant decrease, in the thirty years since Schantz ... we are compelled to disagree with the conclusion reached by the trial judge in Schantz that ‘there is a sufficient use of [privately piloted] aircraft in our area so that it can be said that the installation of a landing strip from personal use is accessory to the use of property as a residence.’” Tanis v. Township of Hampton, 306 N.J.Super. 588, 605 (1997), citing Shantz v. Rachlin, 101 N.J.Super. 334, 342 (1968).

This court notes however, that this court does not agree with the rationale of the Zoning Board that only one building can be an accessory use to the primary use of the property. There is no case law to support this finding of the Zoning Board. This court finds that the denial of the permit for the second hangar and the denial for the permit to expand the existing hangar was appropriate because the initial hangar does not properly constitute an accessory use. But, due to the statute of limitations, this court may not prohibit Garabedian from continuing to use his existing hangar.